# IN THE SUPREME COURT OF CALIFORNIA

KWANG K. SHEEN,

Plaintiff and Appellant,

v.

WELLS FARGO BANK, N.A.,

Defendant and Respondent.

S258019

Second Appellate District, Division Eight
B289003

Los Angeles County Superior Court
BC631510

March 7, 2022

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and McConnell[*] concurred.

Justice Liu filed a concurring opinion.

Justice Jenkins filed a concurring opinion.

---

[*]     Administrative Presiding Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, § 6 of the California Constitution.

SHEEN v. WELLS FARGO BANK, N.A.

S258019

Opinion of the Court by Cantil-Sakauye, C. J.

Several years after purchasing his house, plaintiff Kwang K. Sheen used the home as collateral for two loans he took from defendant Wells Fargo Bank, N.A. (Wells Fargo). Plaintiff subsequently suffered financial setbacks and missed payments on these junior loans. He submitted applications to Wells Fargo to modify the loans, but Wells Fargo did not respond. Instead, it sent plaintiff letters informing him of the actions it might take because of the delinquency of his accounts. The letters did not specifically mention foreclosure. Plaintiff alleges that because "Wells Fargo did not provide [him] with a written determination regarding his eligibility for modification" of the loans prior to sending him the letters, plaintiff "believed the letters meant that the . . . Loans had been modified such that they were unsecured loans" and his house "would never be sold at a foreclosure auction." Eventually, Wells Fargo sold plaintiff's debt. Four years later, the owner of the debt foreclosed on plaintiff's home. Plaintiff sued Wells Fargo.

Specifically, plaintiff asserted a negligence claim against Wells Fargo, alleging that the bank "owed Plaintiff a duty of care to process, review and respond carefully and completely to the loan modification applications Plaintiff submitted." Plaintiff alleged that Wells Fargo breached this duty, causing him to "forgo alternatives to foreclosure," and hence Wells Fargo is liable for monetary damages relating to the loss of his house, including the value of the home, the hotel and storage costs

1

plaintiff incurred when he had to vacate the property, and the damage to his credit rating. Wells Fargo demurred, arguing that it owed plaintiff no such duty. The Court of Appeal affirmed the lower court's decision to sustain the demurrer but noted that "[t]he issue of whether a tort duty exists for mortgage modification has divided California courts for years." (*Sheen v. Wells Fargo Bank, N.A.* (2019) 38 Cal.App.5th 346, 348 (*Sheen*).)

In this case, we address the issue dividing the lower courts: Does a lender owe the borrower a tort duty sounding in general negligence principles to (in plaintiff's words) "process, review and respond carefully and completely to [a borrower's] loan modification application," such that upon a breach of this duty the lender may be liable for the borrower's economic losses — i.e., pecuniary losses unaccompanied by property damage or personal injury? (See, e.g., *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 398 (*Gas Leak Cases*).) We conclude that there is no such duty, and thus Wells Fargo's demurrer to plaintiff's negligence claim was properly sustained.

Neither plaintiff's assertion of a "special relationship" between himself and Wells Fargo nor his invocation of the factors articulated in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 (*Biakanja*) provides a compelling basis to recognize such a duty. Plaintiff's claim arises from the mortgage contract he had with Wells Fargo, and as such, falls within the ambit of the economic loss doctrine. That judicially created doctrine bars recovery in negligence for pure economic losses when such claims would disrupt the parties' private ordering, render contracts less reliable as a means of organizing commercial relationships, and stifle the development of contract law. (See, e.g., *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004)

34 Cal.4th 979, 988–989 (*Robinson*); Rest.3d Torts, Liability for Economic Harm (June 2020) § 3, com. b., p. 3 (Restatement).)

There is good reason to adhere to the economic loss rule in this case, given the nature of the parties' contractual relationship and how that relationship might be disrupted by recognition of the duty plaintiff advances. In addition, we recognize the role of the Legislature, which is better positioned to act in this extensively regulated area. Plaintiff's rationale for imposing a duty cannot easily be cabined to the mortgage context and there are real costs associated with the duty plaintiff proposes — costs that, among other things, pit the interests of homeowners in default against those seeking affordable home loans. Such a balancing of interests, and more generally of the "social costs and benefits" (*Aas v. Superior Court* (2000) 24 Cal.4th 627, 652 (*Aas*)) implicated by plaintiff's contentions, is best performed by the Legislature.

Meanwhile, because plaintiff does not assert an action for negligent misrepresentation nor one for promissory estoppel, we have no reason to consider whether either or both of these claims might be viable given the facts he alleges. More generally, nothing we say in this opinion should be understood to categorically preclude those claims in the mortgage modification context.

The Court of Appeal came to the same conclusion that we do — there is no duty of the sort pressed by plaintiff. We therefore affirm the judgment below.

## I. BACKGROUND

Because this case comes to us after the trial court sustained Wells Fargo's demurrer, we take as true all properly pleaded material facts, but not conclusions of fact or law

asserted in the complaint. (See, e.g., *Gas Leak Cases*, *supra*, 7 Cal.5th at p. 395; *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.)

Plaintiff alleges that in 1998, he purchased a home ("the Property") in Los Angeles using a "first-lien mortgage loan . . . secured by the Property." That loan is not at issue in this case. Seven years later, plaintiff obtained two loans from Wells Fargo secured by the same property. These two loans, which the complaint refers to as the "Second Loan" and the "Third Loan," were in the amounts of $167,820 and $82,037.14, respectively.

Beginning in 2008 or 2009, plaintiff missed a number of payments on the Second and Third Loans because of financial difficulties he experienced "in the wake of the global financial crisis." Wells Fargo recorded notices of default in connection with the loans and scheduled a foreclosure sale of the Property for early February 2010.

Plaintiff and his legal representative subsequently contacted Wells Fargo "regarding the possibility of cancelling the foreclosure sale . . . so that Plaintiff could apply and be considered for modification for the Second and Third Loans." In late January 2010, plaintiff submitted applications to modify the Second and Third Loans. About a week thereafter, Wells Fargo cancelled the February foreclosure sale date.

Plaintiff alleges that "Wells Fargo never contacted Plaintiff about the status of his mortgage applications" nor informed him "whether his applications for modification of the Second and Third Loans had been approved or rejected." On or about March 17, 2010 — a month and a half after plaintiff submitted his applications — Wells Fargo sent plaintiff two almost identical letters, one in connection with each of the loans.

Although the complaint does not attach a copy of the letters, it does quote a paragraph from the communications, which reads:

> "Due to the severe delinquency of your account, it has been charged off and the entire balance has been accelerated. Accordingly, your entire balance is now due and owing. In addition, we have reported your account as charged off to the credit reporting agencies to which we report. As a result of your account's charged off status, we will proceed with whatever action is deemed necessary to protect our interests. This may include, if applicable, placing your account with an outside collection agency or referring your account to an attorney with instructions to take whatever action is necessary to collect this account. Please be advised that if Wells Fargo elects to pursue a legal judgment against you and is successful, the amount of the judgment may be further increased by court costs and attorney fees."

Also pursuant to the complaint, the letters advised plaintiff "to call Wells Fargo immediately if he had any questions."

Plaintiff alleges he "believed the letters meant that the Second and Third Loans had been modified such that they were unsecured loans . . . and that the Property would never be sold at a foreclosure auction in connection with either the Second or the Third Loan as a result of these modifications." Plaintiff based this belief not just on the letters themselves, but also on the fact that they had been sent when Wells Fargo had not yet responded to his mortgage modification applications. According to plaintiff, he "received the March 17, 2010 letters while his

applications for mortgage modification were still pending, as Wells Fargo did not provide Plaintiff with a written determination regarding his eligibility for modification of the Second and Third Loans prior to March 17, 2010. [¶] Plaintiff therefore believed that Wells Fargo sent the March 17, 2010 letters in response to the applications for mortgage modification that he had submitted to Wells Fargo in or about January 2010. He believed that the letters meant that the Second and Third Loans had been modified such that . . . the Property would never be sold at a foreclosure auction."

Plaintiff alleges that subsequent events corroborated his understanding of the letters. First, sometime in March 2010, Wells Fargo called plaintiff's wife. According to plaintiff, "During this phone call, a Wells Fargo representative told Ms. Sheen that there would be no . . . foreclosure sale of Plaintiff's home but that Wells Fargo would continue to attempt to collect money Plaintiff owed to Wells Fargo." Second, Wells Fargo sent plaintiff a letter offering to reduce by half the amount owing on the Second Loan if plaintiff would pay the entire amount. Because the letter "made no direct mention of a possible foreclosure sale and instead referred directly to the intervention of a collection agency in connection with the Second Loan," it "further confirmed Plaintiff's understanding that the Second Loan had been modified such that it was now unsecured." Third, five years after these communications — in November 2015 — Wells Fargo informed plaintiff that it had cancelled (discharged) the Third Loan. Per the complaint, "The November 16, 2015

letter . . . indicated to Plaintiff that . . . the Second Loan, like the Third Loan, had been modified in some way."[1]

In November 2010, Wells Fargo sold plaintiff's Second Loan to another entity. Specifically, it assigned away both its beneficial (ownership) interest and servicing rights.[2] Plaintiff makes no further allegations of improper conduct by Wells Fargo after it sold the loan.

In 2014, four years after Wells Fargo sold plaintiff's Second Loan, the new owner of the loan — Mirabella Investment Group, LLC — foreclosed on the Property. Plaintiff sued, naming both Mirabella and the entity servicing the loan at the time of foreclosure — FCI Lender Services, Inc. (FCI) — as defendants, along with Wells Fargo. In addition to his

---

[1] Wells Fargo had cancelled the Third Loan a year prior, in March of 2014, and informed plaintiff of the fact at that time. It conveyed the same message again in 2015 "in response to a complaint Plaintiff had submitted to the Consumer Financial Protection Bureau." Plaintiff offers no explanation concerning how a letter that was sent after plaintiff's house was foreclosed upon (see *post*) corroborated his belief that both the Second and Third Loans had become unsecured.

[2] The entity holding the servicing rights to a mortgage loan is known as a servicer. A servicer is "responsible for account maintenance activities such as sending monthly statements to mortgagors, collecting payments from mortgagors, keeping track of account balances, handling escrow accounts, calculating interest-rate adjustments on adjustable-rate mortgages, reporting to national credit bureaus, and remitting funds collected from mortgagors to the [owners of the beneficial interest in the loans]." (Levitin & Twomey, *Mortgage Servicing* (2011) 28 Yale J. on Reg. 1, 23 (Levitin).) "Servicers also are responsible for handling defaulted loans, including prosecuting foreclosures and attempting to mitigate investors' losses." (*Ibid.*)

negligence claims, plaintiff advanced causes of action for promissory estoppel (against Mirabella and FCI), intentional infliction of emotional distress, and violation of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.).

Defendants demurred. The trial court sustained Wells Fargo's demurrer to plaintiff's negligence claim, finding that there was no duty on the part of the bank to "respond timely to [plaintiff's] request to modify the second trust deed."

The Court of Appeal affirmed. The court concluded that the relevant authorities "decisively weigh against extending tort duties into mortgage modification negotiations." (*Sheen*, *supra*, 38 Cal.App.5th at p. 348.) It found instructive the position taken by other states and the fact that "the most recent Restatement counsels against this extension because other bodies of law — breach of contract, negligent misrepresentation, promissory estoppel, fraud, and so forth — are better suited to handle contract negotiation issues." (*Ibid.*)

We granted review.

## II. DISCUSSION

As previously explained, the specific question we address in this case is whether Wells Fargo owes plaintiff a duty "to process, review and respond carefully and completely to [his] loan modification applications" so as to avoid causing plaintiff pure monetary loss through a lack of care in handling his applications. Plaintiff does not point to any specific language in his contract — which evidently contains no provisions obligating Wells Fargo to review or respond to plaintiff's modification application — as the source of this duty. Instead, he claims that the duty arises as a matter of law when a borrower submits a loan modification application to a lender, and that a lender's

failure "to process, review and respond carefully and completely" to the application is actionable in tort.

Whether such a tort duty exists is an issue upon which the Courts of Appeal are divided. (Compare *Sheen*, *supra*, 38 Cal.App.5th at p. 358, and *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 68 (*Lueras*) [concluding that the defendants "did not have a common law duty of care to offer, consider, or approve a loan modification"] with *Weimer v. Nationstar Mortgage, LLC* (2020) 47 Cal.App.5th 341, 347–348 (*Weimer*) [recognizing a duty of care in handling a loan modification application]; *Rossetta v. CitiMortgage, Inc.* (2017) 18 Cal.App.5th 628, 641 (*Rossetta*) [same, at least when the lender allegedly is "making default a condition of being considered for a loan modification"]; *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1183 (*Daniels*) [recognizing a duty of care]; *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941, 944, 948 (*Alvarez*) [recognizing a duty owed by the defendant financial institutions to "exercise reasonable care in the review of [the borrower's] loan modification applications" when the "defendants allegedly agreed to consider modification of the plaintiffs' loans"]; see also, e.g., *Hernandez v. Select Portfolio Servicing, Inc.* (C.D.Cal., June 25, 2015, No. CV 15-01896 MMM (AJWx)) 2015 U.S.Dist. Lexis 82922, pp. *54–*56 [documenting a similar split within the federal district courts applying California law]; see also *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 901–906 (*Jolley*) [in a construction loan appeal, court expressed in dicta skepticism regarding "a no-duty rule" within the home residential lending context].)

"Duty is not universal; not every defendant owes every plaintiff a duty of care. A duty exists only if ' "the plaintiff's

interests are entitled to legal protection against the defendant's conduct." ' [Citation.] Whether a duty exists is a question of law to be resolved by the court." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).) "A duty of care may arise through statute" or by operation of the common law. (*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 803 (*J'Aire*).) Below, we consider whether either of these sources of law recognizes a duty "to process, review and respond carefully and completely to . . . loan modification applications" as urged by plaintiff.

### A. Statutory Law

Plaintiff does not identify any statute or regulation that requires Wells Fargo to treat his modification applications with due care. Plaintiff does not rely on the language of Civil Code section 1714, which sets out the " 'general rule' governing duty" (*Brown*, *supra*, 11 Cal.5th at p. 213), as establishing this duty. Despite its broad language, section 1714 does not impose a general duty to avoid purely economic losses. In relevant part, that provision states, "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . ." (Civ. Code, § 1714, subd. (a).) As we have recently explained, "liability in negligence for purely economic losses . . . is 'the exception, not the rule,' under our precedents. [Citation.] And that holds true even though Civil Code section 1714 does not, by its terms, 'distinguish among injuries to one's person, one's property or one's financial interests.' " (*Gas Leak Cases*, *supra*, 7 Cal.5th at p. 400 [so observing in the context of local businesses' suit for damages reflecting the income lost due to the defendant's alleged negligence in allowing a massive gas leak to occur, driving away the businesses' customers]; see also *id.* at p. 399

["What Civil Code section 1714 does not do is impose a presumptive duty of care to guard against any conceivable harm that a negligent act might cause"]; accord, *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 58 (*Quelimane*).)

Nor does plaintiff identify any other statute or regulation as imposing the duty he asks us to recognize. He does not ground such a duty in the extensive body of state and federal legislation and regulations that address mortgage servicing and, more specifically, the process mortgage servicers must follow with regard to handling modification applications, including the California Homeowner Bill of Rights (HBOR). (Civ. Code, § 2923.4 et seq.) As Wells Fargo points out, "where they apply," HBOR and complementary federal legislation specify various affirmative actions a servicer is obligated to take when receiving modification applications. For example, HBOR specifies that upon receiving certain modification applications, "the mortgage servicer shall provide written acknowledgment of the receipt of the documentation" and must include in that acknowledgement "an estimate of when a decision on the loan modification will be made," "deadlines to submit missing documentation," "[a]ny expiration dates for submitted documents," and "[a]ny deficiency in the . . . modification application." (Civ. Code, § 2924.10, subd. (a)(1)–(4); see also 12 C.F.R. § 1024.41(b)(2)(i)(B), (c)(3) (2013).) In addition, the servicer is required to apprise the borrower of any foreclosure prevention alternative it offers before foreclosing, cannot foreclose while a modification application is pending (Civ. Code, §§ 2924.9, subd. (a), 2923.6, subd. (c)), and must give "written notice to the borrower identifying the reasons" for denying an application if it does so (Civ. Code, § 2923.6, subd. (f)).

Yet neither HBOR nor any other state or federal statute or regulation applies here to impose a duty along the lines sketched by plaintiff. By its plain terms, HBOR's provisions apply only to *first lien* mortgages. (See Civ. Code, § 2924.15, subd. (a) ["Unless otherwise provided, paragraph (5) of subdivision (a) of Section 2924, and Sections 2923.5, 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, and 2924.18 shall apply only to a first lien mortgage or deed of trust that meets either of the following criteria"]; see also, e.g., Civ. Code, § 2924.10, subd. (a) [specifying requirements applicable "[w]hen a borrower submits a complete first lien modification application or any document in connection with a first lien modification application"].) Because the loans at issue in this case were junior loans — the second and third loans that plaintiff secured using the Property as collateral — HBOR does not apply. Likewise, plaintiff does not bring a claim under any other state or federal law governing mortgage loan modifications, such as the California Foreclosure Prevention Act (Civ. Code, § 2924 et seq.), the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.), or the Home Affordable Modification Program (12 U.S.C. § 5201 et seq.). Plaintiff has determined that these laws "did not or could not offer him the type of relief he wanted" (*Sheen*, *supra*, 38 Cal.App.5th at p. 352), and we have no reason to revisit this assessment.

## B. Common Law

Rather than focusing on any statute, plaintiff grounds his negligence claim in the common law. We conclude that this effort fails in light of the economic loss rule. Nor can a duty to "process, review, and respond carefully and completely to Plaintiff's loan modification applications" be justified by reference to the *Biakanja* factors. Those factors are commonly

employed to ascertain whether a court should recognize a duty, but are useful and appropriate for that purpose only in situations involving parties that are *not* in privity with one another. Finally, the policy justifications plaintiff advances for the recognition of a duty are unpersuasive — and in any event, the policy considerations implicated here are better left to the Legislature.

### 1. *Economic Loss Rule*

We begin with a review of the contours of the economic loss rule. The rule itself is deceptively easy to state: In general, there is no recovery in tort for negligently inflicted "purely economic losses," meaning financial harm unaccompanied by physical or property damage. (*Gas Leak Cases*, *supra*, 7 Cal.5th at p. 400; see also *Aas*, *supra*, 24 Cal.4th at p. 636 ["In actions for negligence, a manufacturer's liability is limited to damages for physical injuries; no recovery is allowed for economic loss alone. [Citation.] This general principle [is] the so-called economic loss rule"]; *Seely v. White Motor Co.* (1965) 63 Cal.2d 9, 18 (*Seely*) [similar]; Rest., § 1 ["An actor has no general duty to avoid the unintentional infliction of economic loss on another"].)

The economic loss rule has been applied in various contexts. First, it carries force when courts are concerned about imposing " 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.' " (*Gas Leak Cases*, *supra,* 7 Cal.5th at p. 414, quoting *Ultramares Corp. v. Touche* (N.Y. 1931) 174 N.E. 441, 444.)

In another recurring set of circumstances, the rule functions to bar claims in negligence for pure economic losses in deference to a contract between litigating parties. (See

*Robinson, supra,* 34 Cal.4th at p. 988 ["Quite simply, the economic loss rule 'prevent[s] the law of contract and the law of tort from dissolving one into the other' "]; *Aas, supra,* 24 Cal.4th at pp. 635–636; accord, *Erlich v. Menezes* (1999) 21 Cal.4th 543, 550–551 (*Erlich*); *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 398 (*Bily*); *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 (*Foley*).) Regarding this latter branch of the doctrine, one scholar has stated, "Using contract law to govern commercial transactions lets parties and their lawyers know where they stand and what they can expect to follow legally from the words they have written. But if a disappointed buyer has the option of abandoning the contract and suing in tort, the significance of the contract is diminished and the doctrines that protect the integrity of the contractual process are reduced in importance. Parties wrangle over integration clauses to make clear that their obligations are the ones stated in the contract and nothing else; the point of bothering about such matters becomes unclear if a disappointed party can later invoke an outside set of obligations that are imposed on the promisor and defined by the law of tort." (Farnsworth, *The Economic Loss Rule* (2016) 50 Val.U. L.Rev. 545, 553–554 (Farnsworth).) The Restatement states this form of the economic loss rule thusly: "[T]here is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties." (Rest., § 3.)

Because it involves parties who are in contractual privity, this strand of the economic loss rule is sometimes referred to as the "contractual economic loss rule," "contractual rule," or "consensual paradigm." (See, e.g., Sharkey, *In Search of the Cheapest Cost Avoider: Another View of the Economic Loss Rule* (2018) 85 U.Cin. L.Rev. 1017, 1018–1019 (Sharkey); Dobbs, *An*

*Introduction to Non-Statutory Economic Loss Claims* (2006) 48 Ariz. L.Rev. 713, 714.) The Restatement offers an illuminating explanation of this form of the economic loss rule. According to the Restatement, the principle that "there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties" (Rest., § 3 at p. 2) "serves several purposes." (*Id.*, com. b., p. 3.) For one, it "protects the bargain the parties have made against disruption by a tort suit." (*Ibid.*) For another, "the rule allows parties to make dependable allocations of financial risk without fear that tort law will be used to undo them later." (*Ibid.*) "Viewed in the long run," therefore, "the rule prevents the erosion of contract doctrines by the use of tort law to work around them." (*Ibid.*)

Not all tort claims for monetary losses between contractual parties are barred by the economic loss rule. But such claims are barred when they arise from — or are not independent of — the parties' underlying contracts. (See *Robinson, supra*, 34 Cal.4th at p. 991 [holding that "the economic loss rule does not bar [the plaintiff's] fraud and intentional misrepresentation claims because they were independent of [the defendant's] breach of contract"]; *Erlich, supra*, 21 Cal.4th at pp. 551, 552 [explaining that "[t]ort damages have been permitted in contract cases" when "the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm"].) Plaintiff's claim here arises from, and is not independent of, the mortgage contract.

### a. The Economic Loss Rule Bars Plaintiff's Negligence Claim

Plaintiff and Wells Fargo had a contract. Plaintiff's complaint alleges that he "obtained a second-lien residential mortgage from Wells Fargo" that was "secured by the Property pursuant to a deed of trust."[3] Plaintiff thus had an agreement with Wells Fargo that specified the parties' rights and obligations with respect to the mortgage loan and the collateral securing the loan. In particular, the fact that the mortgage was "secured by the Property pursuant to a deed of trust" (impliedly with the power of sale) means the parties agreed that Wells Fargo would have the right to seize and sell the property in satisfaction of the debt should plaintiff stop making payments on the loan. (See, e.g., *Trustors Security Service v. Title Recon Tracking Service* (1996) 49 Cal.App.4th 592, 595; 5 Miller & Starr, Cal. Real Estate (4th ed.) Deeds of Trusts and Mortgages, § 13.1, p. 13-16.) These were the terms of the parties' agreement.

Plaintiff and Wells Fargo did *not* agree that should plaintiff default and attempt to renegotiate his loan by submitting a modification application, Wells Fargo would "process, review and respond carefully and completely to the . . . applications Plaintiff submitted," and could foreclose only after discharging such obligations.[4] (Accord, *Copeland*, *supra*, 96

---

[3] Plaintiff makes similar allegations with respect to the Third Loan, but we focus here on the Second Loan because the Third Loan ultimately was discharged.

[4] Plaintiff's briefs at times appear to argue that even if Wells Fargo had no initial obligation to handle the requested loan modifications with due care, such an obligation arose once

Cal.App.4th at pp. 1257–1259 [discussing and upholding the validity of a contract to negotiate, or an agreement to negotiate the terms of a future contract].)[5] To impose a tort duty in such

---

Wells Fargo "agree[d] to consider a modification of an applicant's loan."

Plaintiff's complaint, however, is devoid of any allegation that Wells Fargo actually agreed to consider his applications. Plaintiff's pleading merely alleges that he submitted the applications and then did not receive a response or a "written determination" from Wells Fargo. These allegations do not give rise to a reasonable inference that Wells Fargo agreed to "consider a modification of [the] applicant's loan."

Furthermore, even if Wells Fargo did accept the applications for consideration, it is unclear why mere acceptance of the applications would give rise to a tort duty to "process, review, and respond carefully and completely to the loan modification applications." As the Restatement makes clear, even when parties are actively negotiating a contract, "there is no liability in tort for economic loss caused by negligence" during such negotiations. (Rest., § 3; see also *id.*, com. b., p. 2; accord, *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251, 1260 (*Copeland*) ["When two parties, under no compulsion to do so, engage in negotiations to form or modify a contract neither party has any obligation to continue negotiating or to negotiate in good faith. Only when the parties are under a contractual compulsion to negotiate does the covenant of good faith and fair dealing attach"]; *Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031 [explaining that, absent an express agreement to the contrary, a defendant had no contractual obligation to "negotiate new terms of the concession contract, [and] that its commencement and continuance of negotiations over a long period of time had no effect upon this lack of obligation"].)

[5] In part II.B.2.b, *post*, we address the Attorney General's argument that due to imperfect rationality, understanding, or attention, a borrower is unlikely to bargain regarding terms that

circumstances would go further than creating obligations unnegotiated or agreed to by the parties; it would dictate terms that are *contrary* to the parties' allocation of rights and responsibilities. The proposed duty would impede Wells Fargo's right to foreclose by permitting foreclosure only after Wells Fargo discharges a tort duty to "process, review and respond carefully and completely to [a borrower's] loan modification application[s]."

Put differently, plaintiff's claim here is not independent of the original mortgage contract, not because his claim merely relates to the subject of that agreement, but because it is based on an asserted duty that is contrary to the rights and obligations clearly expressed in the loan contract. If we are to give deference to the parties' agreement — and more generally to accord respect to contract doctrines — we cannot sustain a tort duty in such circumstances. (Accord, e.g., *Robinson*, *supra*, 34 Cal.4th at pp. 992–993 [" ' "[W]hen two parties make a contract, they agree upon the rules and regulations which will govern their relationship; the risks inherent in the agreement and the likelihood of its breach. . . . Under such a scenario, it is appropriate to enforce only such obligations as each party

_____

would become relevant only in the event the borrower needed to modify a loan. We note, however, that this is different from an argument that a borrower *could not* as a matter of law have negotiated over such terms. As the *Copeland* court explained, there is "no reason why in principle the parties could not enter into a valid, enforceable contract to negotiate the terms" of contract that is neither "illegal [n]or immoral." (*Copeland*, *supra*, 96 Cal.App.4th at p. 1257.) A mortgage contract is obviously legal, as are modifications of such contracts.

voluntarily assumed, and to give him only such benefits as he expected to receive; this is the function of contract law" ' "].)

### b. *Opinions from Other Jurisdictions Support the Approach We Adopt Today*

The application of the economic loss rule to bar plaintiff's asserted tort claim is consistent with well-reasoned decisions from other federal and state courts, including the views of other state supreme courts that have addressed the issue before us.

In *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012) 673 F.3d 547, 558 (*Wigod*), the plaintiff homeowner applied to modify her mortgage loan. The defendant bank "determine[d] that Wigod was eligible" for modification under the federal Home Affordable Mortgage Program (HAMP) and sent her an agreement known as a Trial Period Plan (TPP). (*Ibid.*) When the bank ultimately failed to offer Wigod a loan modification, Wigod sued in contract and in tort. The circuit court, applying Illinois law, held that Wigod had stated a valid breach of contract claim under the TPP.[6]

The court rejected Wigod's negligence claim, however, concluding that it was foreclosed by the economic loss rule. (*Wigod*, *supra*, 673 F.3d at pp. 555, 567.) Wigod had argued that the bank had a duty to hire qualified customer service employees and train them to implement HAMP effectively. (See

---

[6] In part II.B.1.e., *post*, we discuss the significance — or lack thereof — of whether plaintiff has a viable contract claim against Wells Fargo. Here, we note that Wigod's contract cause of action was based on an asserted breach of the TPP, and not of the original mortgage agreement. (*Wigod*, *supra*, 673 F.3d at pp. 558–561.) With regard to the original mortgage contract, therefore, Wigod's position was not materially different from plaintiff's.

*Wigod,* at p. 567.) The court disagreed, explaining that "[t]o the extent Wells Fargo had a duty to service Wigod's loan responsibly and with competent personnel, that duty emerged solely out of its contractual obligations." (*Id.* at p. 568.) "Wigod's rights," continued the court, "are contractual in nature. If [the defendant bank] failed to honor their agreement — whether by hiring incompetents or simply through bald refusals to perform — contract law provides her remedies." (*Ibid.*) That contract itself, the court continued, " 'cannot give rise to an extra-contractual duty without some showing of a fiduciary relationship between the parties,' and no such relationship existed here." (*Ibid.*) Because Wigod had alleged only economic injury and the bank's duty did not exist "independent of the contract," Wigod's negligence claim was barred by the economic loss rule. (*Id.* at p. 567.)

The Supreme Court of Connecticut has similarly declined to "recognize a common-law duty requiring a loan servicer to use reasonable care in the review and processing of a mortgagor's loan modification applications." (*Cenatiempo v. Bank of America, N.A.* (Conn. 2019) 219 A.3d 767, 791 (*Cenatiempo*).) The court's analysis began with the premise that "the law does not impose a duty on lenders to use reasonable care in its commercial transactions with borrowers because the relationship between lenders and borrowers is contractual and loan transactions are conducted at arm's length." (*Id.* at p. 792.) It then reasoned there was no " 'strong showing of policy reasons' " to warrant different treatment of "a relationship between an investor's loan servicer and a mortgagor [due to] the former's review and processing of a loan modification application." (*Id.* at pp. 795, 793.) Accordingly, the court

concluded the servicer owed no "common-law duty of care to the plaintiff[] [borrowers]." (*Id.* at p. 795.)

Likewise, in *House v. U.S. Bank Nat. Association* (Mont. 2021) 481 P.3d 820, 828, the Montana Supreme Court reiterated that "[u]nless otherwise provided by contract, a lender generally has no duty to modify, renegotiate, waive, or forego enforcement of the terms of a mortgage loan in order to assist a borrower to avoid a default or foreclosure." Therefore, "[a]lleged errors or omissions by a lender in the servicing or administration of a mortgage loan [are] . . . generally compensable only in contract . . . ." (*Ibid.*; see also *Flagstaff Housing v. Design Alliance* (Ariz. 2010) 223 P.3d 664, 670 [stating that in the construction defect context "if the parties do not provide otherwise in their contract, they will be limited to contractual remedies" for pure economic loss].) The Montana high court did note that "if the lender gives extraordinary advice . . . beyond that customary in arms-length lending and loan servicing transactions," such "extraordinary circumstances . . . may . . . independently give rise to a special common law fiduciary duty of care." (*House,* at pp. 828–829; see also *id.* at p. 829 ["However, . . . merely offering, administering, or providing general information regarding program eligibility, requirements, or process for a distressed loan modification . . . is insufficient alone to give rise to a special fiduciary relationship or duty between a lender and borrower"].) As we explain below, such a rule — which may be restated as "a lender owes no duty of care to a borrower when the lender's involvement in the loan transaction does not exceed its customary role in arms-length

lending and servicing" — is consistent with case law from our Courts of Appeal.[7]

### c. *Our Courts of Appeal Have Recognized the Economic Loss Rule Within the Lender-Borrower Context*

Our rejection of plaintiff's arguments as incompatible with the economic loss rule also harmonizes with a well-established principle of state law commonly attributed to *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089 (*Nymark*). In *Nymark*, the court stated a "general rule" precluding certain tort claims in the lender-borrower context: "[A] financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Id.* at p. 1096.) We understand this general principle (which is distinct from *Nymark*'s additional assessment that *Biakanja* "support[ed] [its] conclusion that [the] defendant did not owe a duty of care to [the] plaintiff" (*Nymark*, at p. 1099)) as a refinement of the contractual economic loss rule in the lender-borrower context, which asks in the first instance whether the alleged negligence occurred within the scope of the parties' contractual relationship. In the time since *Nymark* articulated this rule, it has been uniformly accepted among our Courts of Appeal, even by those that have held financial institutions owe

---

[7] In contrast to the above views, plaintiff points to no state supreme court that has embraced the duty he now urges upon us. Although a minority few opinions by state intermediate courts may have recognized a duty within the loan modification context (see, e.g., *Sheen supra*, 38 Cal.App.5th at pp. 355–356 [collecting out-of-state and federal cases]), we regard those decisions declining to do so as more persuasive.

their borrowers a duty of care in the loan modification context. (See *Weimer, supra,* 47 Cal.App.5th at pp. 355–356; *Rossetta, supra,* 18 Cal.App.5th at p. 637; *Daniels, supra,* 246 Cal.App.4th at pp. 1180–1182; *Alvarez, supra,* 228 Cal.App.4th at pp. 945–946; accord, *Jolley, supra,* 213 Cal.App.4th at p. 898.)

None of these courts, however, have regarded the general rule stated in *Nymark, supra,* 231 Cal.App.3d 1089 as compelling in the loan modification context, concluding instead that *Biajanka* sets the appropriate standard to determine whether a duty of care exists in this setting. (See *Weimer, supra,* 47 Cal.App.5th at pp. 355–356; *Rossetta, supra,* 18 Cal.App.5th at p. 637; *Daniels, supra,* 246 Cal.App.4th at pp. 1180–1182; *Alvarez, supra,* 228 Cal.App.4th at pp. 945–946, 948; *Jolley, supra,* 213 Cal.App.4th at pp. 899–902.) We shall turn to *Biakanja* and its application below. For now, we note that the *Nymark* general rule ordinarily applies "when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Nymark, supra,* 231 Cal.App.3d at p. 1096.)

Plaintiff maintains that the affirmative duty to act — to process, review, and respond to the loan modification applications — is outside *Nymark*'s reach because that decision's holding "is limited to the loan origination context." Yet, plaintiff evades the central question relevant to the applicability of *Nymark*'s general principle: whether the handling of a loan modification application is within the scope of Wells Fargo's role as a lender. We believe it is. A lender's handling of a modification application is part of a process by which the lender decides whether it should adhere to the existing contract or offer a new agreement (and if so, under what terms). It is a step in the lender's determination concerning how

best to collect the money it had dispersed under the loan, whether that be by foreclosing (seizing and selling the collateral to pay back the loan) or offering new terms that are less favorable to the lender than the original contract but that potentially improve the odds of the borrower paying. In short, a lender's involvement in the loan modification process — specifically whether it "process[es], review[s] and respond[s] carefully and completely to the loan modification applications [a borrower] submitted" — is part and parcel of its assessment regarding how best to recoup the money it is owed.

Such involvement, without more, does not "exceed the scope of [an institution's] conventional role as a mere lender of money." (*Nymark, supra*, 231 Cal.App.3d at p. 1096; see *Lueras, supra*, 221 Cal.App.4th at p. 67 ["a loan modification is the renegotiation of loan terms, which falls squarely within the scope of a lending institution's conventional role as a lender of money"]; *Armstrong v. Chevy Chase Bank, FSB* (N.D.Cal., Oct. 3, 2012, No. 5:11-cv-05664 EJD) 2012 U.S.Dist. Lexis 144125, pp. *11–*12 ["a loan modification . . . is nothing more than a renegotiation of loan terms. . . . Outside of actually lending money, it is undebatable that negotiating the terms of the lending relationship is one of the key functions of a money lender. For this reason, '[n]umerous cases have characterized a loan modification as a traditional money lending activity' "]; *Carbajal v. Wells Fargo Bank, N.A.* (C.D.Cal., Apr. 10, 2015, No. CV 14-7851 PSG (PLAx)) 2015 U.S.Dist. Lexis 47918, p. *13 ["In a modification application mishandling case, there is no 'active participation' in the borrower's financed enterprise that demonstrates that the lender is acting outside the scope of conventional arms-length lending activity"].) In sum, although " ' "*Nymark* does not support the sweeping conclusion that a

lender never owes a duty of care to a borrower" ' " (e.g., *Rossetta, supra*, 18 Cal.App.5th at p. 637), it does support the conclusion that a lender owes no duty to a borrower in its processing of a loan modification application.

### d. *Cases Not Applying the Economic Loss Rule Are Inapposite*

It is true that we have, in certain contexts, allowed tort actions to proceed even though they arise from, and are not independent of, a contract, despite the economic loss rule. Specifically, we have allowed for tort recovery in some cases involving insurance policies and contracts for professional services. (See, e.g., *Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 923 (*Jonathan Neil*) ["The remedy for breach of [the implied] covenant [of good faith and fair dealing] is generally limited to contract damages, but we have recognized an exception to this rule when the breach occurs in the context of an insurance company's failure to properly settle a claim against an insured, or to resolve a claim asserted by the insured"]; *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 180–181 (*Neel*) ["Legal malpractice" "gives rise to an action in tort"].) But there are good reasons for treating modification negotiations between mortgage lenders and borrowers differently.

> (*i*) *Mortgage lending and modification do not share the special characteristics associated with contexts exempted from the reach of the economic loss rule*

As we have recognized, "[t]he insurance cases . . . were a major departure from traditional principles of contract law." (*Foley, supra*, 47 Cal.3d at p. 690; see also *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 43 (*Cates*

*Construction*).) We therefore must "consider with great care claims that extension of the exceptional approach taken in those cases is automatically appropriate if certain hallmarks and similarities can be adduced in another contract setting." (*Foley*, at p. 690.) Exercising the necessary care, we have rejected arguments that employment contracts, performance bonds, or even "an insurance company's breach of the covenant [of good faith and fair dealing] when it retroactively overcharges a premium it knows is not owed" are sufficiently analogous to the core insurance cases to warrant extension of tort remedies into those areas. (*Jonathan Neil*, *supra*, 33 Cal.4th at p. 923; see also *Foley*, at p. 693 [concluding that "the employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies"]; *Cates Construction*, at p. 60 [holding that tort recovery is inappropriate "for a breach of the implied covenant of good faith and fair dealing in the context of a construction performance bond" because "a construction performance bond is not an insurance policy"].)

We come to the same conclusion here regarding mortgage contracts and modification applications. In examining the "particular characteristics" of insurance policies that justify the "exceptional approach" we have taken in the insurance setting (*Cates Construction*, *supra*, 21 Cal.4th at pp. 45, 46), we see that a number of those characteristics do not inhere in the mortgage modification context. Within the insurance context, these special characteristics include the fact that "when an insurer in bad faith refuses to pay a claim or to accept a settlement offer within policy limits," "the insured cannot turn to the marketplace to find another insurance company willing to pay for the loss already incurred." (*Foley*, *supra*, 47 Cal.3d at p. 692.)

Moreover, "insurance policies are not purchased for profit or advantage; rather, they are obtained for peace of mind and security in the event of an accident or other catastrophe" (*Cates Construction*, at p. 44), thus making the role of the insurance companies "with whom individuals contract specifically in order to obtain protection from potential specified economic harm" quasi-public in nature. (*Foley*, at p. 692; see also *Egan v. Mut. of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819 (*Egan*); *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1148 (*Love*) ["Insurance contracts are unique in nature and purpose. . . . Because peace of mind and security are the principal benefits for the insured, the courts have imposed special obligations, consonant with these special purposes, seeking to encourage insurers promptly to process and pay claims"].) In addition, "the insurer's and insured's interest are financially at odds," because paying a claim directly harms an insurer's bottom line. (*Foley, supra*, 47 Cal.3d at p. 693.) Because of these characteristics, the insurer and insured are said to be in a "special" or quasi-fiduciary relationship. (See, e.g., *Egan, supra*, 24 Cal.3d at p. 820; *McCormick v. Sentinel Life Ins. Co.* (1984) 153 Cal.App.3d 1030, 1050 (*McCormick*) ["the considerations involved in imposing liability on an insurer for unreasonably and in bad faith denying coverage under a policy" include "the quasi-public nature of the insurance industry, the quasi-fiduciary relationship between insurer and insured, and significantly, the purpose of purchasing insurance — ensuring that the insured will be protected against losses incident to a disability or other catastrophe"].)

For present purposes, lenders are not akin to insurers when they contract with consumers for mortgage loans. Although in extending mortgage loans banks may be facilitating

home ownership in a broad sense, they are not providing protection or insurance. Mortgage loans (especially non-purchase or junior loans like those at issue in this case) are not typically taken "for peace of mind and security in the event of an accident or other catastrophe" but for "profit or advantage" — the lender gets paid interest and the borrower gets access to money. (*Cates Construction*, *supra*, 21 Cal.4th at p. 44.) This difference means that as compared to the quasi-public nature of insurance, mortgage contracts more closely resemble "a typical commercial contract." (*Foley*, *supra*, 47 Cal.3d at p. 692; see also *Voris v. Lampert* (2019) 7 Cal.5th 1141, 1162 [rejecting a conversion claim for nonpayment of wages when the availability of such a claim would "transform a category of contract claims into torts, and pile additional measures of tort damages on top of statutory recovery"].)

Given the mutual advantages of mortgage loans, lenders and borrowers are not "financially at odds" to the same degree as insurers and insureds. (*Foley*, *supra*, 47 Cal.3d at p. 693.) Even within a modification context, the relationship between the borrower and lender is more analogous to that of an employee and employer. Similar to how paying salary typically benefits both the worker being paid and the employer who gets work done (see *Foley*, at p. 693), a loan modification benefits both the borrower, who receives a lower payment obligation, and the lender, who receives repayment that may not otherwise be forthcoming. True, not every modification application results in a successful modification, but the possibility of benefiting from the transaction means a lender normally has an incentive to engage in the negotiation. As such, "there is less inherent relevant tension between the interests of [lenders and borrowers] than exists between that of insurers and insureds,"

and "the need to place disincentives on [a lender's] conduct in addition to those already imposed by law simply does not rise to the same level as that created by the conflicting interests at stake in the insurance context." (*Ibid.*)

> (*ii*) *Plaintiff's claim is not similar to those in which tort recovery has been allowed despite the existence of a contract*

Even when tort relief is available within the insurance and professional service contexts, we have limited recovery to specific claims intended to ensure the consumer receives the benefits or services for which he or she has contracted. It would therefore constitute a significant extension of the law to recognize a negligence claim in the mortgage modification context when, as here, the loan agreement does not specify that the lender must duly engage with the borrower's attempt to renegotiate the contract.

To elaborate, one rationale offered for recognizing tort claims in the insurance context is that insurers, who act as gatekeepers to a benefit owed to insureds, should not be allowed to use that power to unreasonably withhold those benefits. (See *Love, supra,* 221 Cal.App.3d at pp. 1151–1153.) This justification recognizes the vulnerability of the insured in receiving the benefits for which the insured has contracted. In other words, we recognize the bad faith tort as a tool to effectuate the purpose of insurance contracts. (See *McCormick, supra,* 153 Cal.App.3d at p. 1050.) Fittingly, we have denied tort relief when insureds' claims are not closely tied to this vulnerability. (See *Jonathan Neil, supra,* 33 Cal.4th at p. 941 [declining to extend tort recovery against excessive retroactive premium charges because the plaintiffs were "not in the same vulnerable position as those who suffer from the insurer's bad

faith claims and settlement practices [because] they were not denied the benefits of the insurance policy"].)

As especially relevant here, lower courts have denied bad faith tort actions for processing delays in the insurance context when benefits were *not* otherwise due to the insured. (See *Love, supra*, 221 Cal.App.3d at p. 1152 [explaining that a processing delay was not "an independent ground for recovery of damages"].) Yet, this is precisely the nature of plaintiff's claim in the present case. As discussed, plaintiff is seeking *only* a processing duty with regard to his loan modification applications. He does not urge us to recognize a duty to process, review and respond carefully and completely to his loan modification application in order to secure the benefit of a bargained-for provision of his loan agreement. He pursues such a duty as an extra-contractual obligation, all the while conceding that his agreement with Wells Fargo confers upon him no right to receive either a loan modification or a specific standard of care in the handling of any modification application. It does not appear that courts have recognized this sort of freestanding process-related duty, even in the insurance bad faith context. To permit tort recovery when it may not be available in the analogous insurance scenario would extend even farther the "major departure from traditional principles of contract law" represented by the insurance cases. (*Foley, supra*, 47 Cal.3d at p. 690.)

Similar considerations distinguish this case from the recognized exception to the economic loss rule for consumers who contract for certain kinds of professional services. In that context, as in the insurance setting, a cause of action for negligence ensures that the consumer receives the services the professional agreed to provide. In such settings, professionals

generally agree to provide "careful efforts" in rendering contracted-for services, but "most clients do not know enough to protect themselves by inspecting the professional's work or by other independent means."  (Rest., § 4, com. a, p. 22; see also *Neel*, *supra*, 6 Cal.3d at p. 188.)  Given this disparity, a claim for professional negligence can serve the important purpose of ensuring that professionals render the "careful efforts" they have contracted to provide.  (Rest., § 4, com. a, p. 22.)

In the present case, again, plaintiff is not simply asking to receive a benefit or service he has contracted for.  Instead, he seeks a duty that appears to cover everything the lender does during the pendency of a loan modification application — from how it manages paperwork to how clearly it communicates with borrowers — that would be difficult to adjudicate in any clear and consistent way across cases.  To recognize a duty of this indefiniteness and breadth seems out of step with our previous exceptions to the contractual economic loss rule, which permit much more cabined relief to ensure, in effect, that contracting parties get what they have contracted for.

In sum, our precedents in the insurance and professional services field do not justify recognition of the duty pressed by plaintiff, which is both more expansive and less well justified than the limited duties answerable in negligence that have been imposed in other spheres.

### e. *Plaintiff's Efforts to Distinguish* Nymark *and the Economic Loss Rule Are Unpersuasive*

Plaintiff advances two arguments why neither *Nymark* nor the economic loss rule applies in this case.  First, he asserts that because he is not claiming a breach of contract, the economic loss doctrine is inapplicable.  According to plaintiff,

31

because Wells Fargo did not "breach its underlying loan agreements with [plaintiff]," his tort claim is not precluded by the economic loss rule. Under plaintiff's framing, the economic loss rule applies only when there is a *breach* of the underlying contract.

The better view, however, is that there does not need to be a viable breach of contract claim for the economic loss rule to apply. This is the view endorsed by the Restatement. The Restatement recognizes that when a contract claim fails because of, say, the parol evidence rule or an integration clause, "[p]ressure to find a tort claim arises because the stakes are high and the plaintiff's position is sympathetic." (Rest., § 3, com. d., p. 4.) Yet, "[u]sing tort law to bypass [the parol evidence rule or other doctrines of contract law] weakens and retards their development." (*Ibid.*) It also "interferes with the ability of others to make reliable agreements in the future." (*Ibid.*) The better alternative, suggests the Restatement, is to "reconsider the application of the parol-evidence rule or other doctrines of contract law" or to look for statutory solutions that "impose responsibility on sellers for certain risks without distorting widely applicable legal principles to reach the desired outcome." (*Ibid.*; see also Farnsworth, *supra*, 50 Val.U. L.Rev. at p. 558.)

In this case, plaintiff has no viable contract claim against Wells Fargo because the mortgage contract between plaintiff and Wells Fargo did not obligate the bank to review or respond to plaintiff's modification application as a precondition to foreclosure. Plaintiff argues that recognition of a tort claim thus would not infringe on the parties' bargain and so would not implicate the economic loss rule's rationale of protecting private ordering. Plaintiff's premise fails. Contrary to his assertion, permitting him to bring a tort claim on the theory that Wells

Fargo owes him a duty to carefully process his modification applications *would* tend to " 'disrupt' the bargain [Wells Fargo and plaintiff] made when they entered into the original loan agreement." Specifically, it would distort Wells Fargo's bargained-for contractual right to foreclose by rendering foreclosure permissible only after Wells Fargo has discharged a tort duty to review, process, and respond to plaintiff's modification application(s). In other words, plaintiff's tort claim — premised on a duty to "process, review, and respond carefully and completely" to a borrower's modification application — is not "independent of the [underlying] contract arising from principles of tort law." (*Erlich, supra*, 21 Cal.4th at p. 551.) Rather, because the imposition of such a duty would impede the bank's contractual right to foreclose, plaintiff's claim arises from the original mortgage contract.

Plaintiff's second argument concerning why the economic loss rule (and *Nymark*) do not apply in this case fares no better. His contention is that at the loan modification stage, borrowers are "captive," meaning they "cannot choose who will service their loans" or handle their requested loan modifications. Moreover, plaintiff's argument goes, borrowers depend "entirely on information from the servicer about whether the loan is likely to be modified, and on the status of the modification." Yet, at the point at which borrowers need to modify their loans, i.e., when they have either defaulted or are on verge of default, they are without the bargaining power to force servicers to provide the information or the level of service they need. Moreover, servicers have their own incentives — for example, cost minimization — which may not align with those of borrowers. These factors, according to some courts, "provide a moral imperative that those with the controlling hand [i.e., the lender

or servicer] be required to exercise reasonable care in their dealings with borrowers seeking a loan modification." (*Alvarez, supra,* 228 Cal.App.4th at p. 949; see also *Weimer, supra,* 47 Cal.App.5th at pp. 362–363 [adopting *Alvarez*'s reasoning]; *Rossetta, supra,* 18 Cal.App.5th at p. 642 [same].)

The difficulty with the argument is that the duties these courts have identified arise precisely because the parties are in a preexisting contractual relationship, one in which their agreement presumably outlined each party's risks, benefits, and obligations to their mutual satisfaction at the time the contract was made. The reason plaintiff is completely dependent on Wells Fargo is because Wells Fargo is his counterparty to the mortgage loan contract. As such, only Wells Fargo has the power to release plaintiff from his existing contractual obligations on the loans plaintiff took from the bank.[8] Having taken a loan from Wells Fargo, plaintiff is " 'captive,' " as he puts it, to the extent that he now cannot ask another bank or servicer to rewrite the terms of his contract with Wells Fargo. (*Alvarez, supra,* 228 Cal.App.4th at p. 949 [quoting from an amicus curiae brief the argument that " 'borrowers are captive, with no choice of servicer' " and " 'cannot pick their servicers or fire them' "].) Similarly, plaintiff has no power " 'to hire [or] fire' " Wells Fargo after submitting his loan modification applications, because

---

[8] To the extent Wells Fargo has assigned such rights to another entity by selling its beneficial interest or servicing right, thus giving the assignee the power to modify (or not) plaintiff's loan terms, it is the mortgage contract itself that gives Wells Fargo the ability to do so. In other words, plaintiff, by that contract, agreed that Wells Fargo was free to assign its interests thusly. (See, e.g., Levitin, *supra,* 28 Yale J. on Reg. at p. 83 [observing that "[f]ree assignability is a standard term" in mortgage loan contracts].)

when he entered into a mortgage loan with Wells Fargo, he agreed to have it — or its choice of assignees — service the loan.[9] (*Ibid.*)  Having so agreed, plaintiff lacks the power to fire Wells Fargo in favor of another servicing entity.  In short, parties find themselves in this position *because* of the contract.

None of this is to deny the difficulties borrowers face in the loan modification context.  One such difficulty is that, if borrowers have agreed that lenders may freely assign loans, borrowers are not thereafter entitled to choose if, when, to whom, and to what extent lenders may assign rights to those loans.  In particular, borrowers do not choose who may subsequently service their loans, and thus who will be the entities with which they will interact in any loan modification attempt. (See, e.g., *Alvarez, supra*, 228 Cal.App.4th at p. 949.)  To compound the problem, a borrower may face bargaining or information asymmetries in the loan modification process. (See, e.g., *Jolley, supra*, 213 Cal.App.4th at p. 900 [in applying the *Biakanja* factors, asserting that the borrower's "ability to protect his own interests in the loan modification process was practically nil"].)

Yet, without denying the quandary of borrowers in distress, we see no sound basis for recognizing a tort duty limited to this situation.  Plaintiff's rationale for bypassing the economic loss rule has no apparent endpoint.  Plaintiff does not articulate any persuasive basis for treating mortgage contracts (and particularly junior-lien loans) differently from various other types of agreements. (Accord, *Foley, supra*, 47 Cal.3d at pp. 693, 696 [despite recognizing "[t]he potential effects on an

---

[9]     Plaintiff does not argue that the assignability provision contained in his contract was nonnegotiable.

individual caused by termination of employment," holding that "contractual remedies should remain the sole available relief for breaches of the implied covenant of good faith and fair dealing in the employment context"]. He has offered no guidance concerning how the modification attempts at issue are to be distinguished from, say, renegotiations of existing employment contracts. (Accord, *id.* at p. 693.) Regardless of the circumstances, whenever parties attempt to modify an existing contract, they cannot choose with whom to bargain, because the only persons with whom to negotiate are the signatories to the original contract (or their choice of assignees, if the contract permits reassignments). Thus, to embrace plaintiff's proposed duty would open the door to a potentially enormous expansion of tort law. Plaintiff has not persuaded us to take such a leap.

### *2.* Biakanja

Plaintiff also argues that "[i]f the lower court had considered the *Biakanja* factors, it would have seen that they squarely point toward a duty of care in the mortgage servicing context." This argument presumes the multifactor approach articulated in *Biakanja* for ascertaining a duty of care applies in this context. We conclude it does not.

### a. Biakanja *Does Not Apply Here*

We begin with *Biakanja* itself. That case involved a will, through which the plaintiff's brother sought to "bequeath[] all his property to [the] plaintiff." (*Biakanja, supra,* 49 Cal.2d at p. 648.) But because the defendant notary public failed to have the will properly attested, the brother's estate passed by intestate succession. (*Ibid.*) The plaintiff, upon receiving "only one-eighth of the estate," sued to recover "the difference between the amount which she would have received had the will been

valid and the amount distributed to her." (*Ibid.*) "The principal question" raised by the case, we said, "is whether [the] defendant was under a duty to exercise due care to protect [the] plaintiff from injury and was liable for damage caused [the] plaintiff by his negligence even though they were not in privity of contract." (*Ibid.*) After reviewing case law bearing on this question, we articulated the following rubric for resolving the issue: "The determination whether in a specific case the defendant will be held liable to *a third person not in privity* is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Id.* at p. 650, italics added.)

*Biakanja* itself thus makes clear that its multifactor test finds application only when the plaintiff is a "third person not in privity" with the defendant. (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) Under its terms, *Biakanja* does *not* apply when the plaintiff and defendant are in contractual privity for purposes of the suit at hand. (Cf. *Brown, supra*, 11 Cal.5th at p. 218 [in holding that the largely similar multifactor test set forth in *Rowland v. Christian* (1968) 69 Cal.2d 10 "serve[s] to determine whether an exception to [Civil Code] section 1714's general duty of reasonable care is warranted," observing that "*Rowland* itself referred to this multifactor test as a guide for determining whether to recognize an 'exception' to the general duty of care"].)

This limitation makes sense, because as Wells Fargo explains, the *Biakanja* framework does "nothing to pinpoint

whether imposing a general duty of care would upset the parties' contractual expectations and 'dissolv[e]' the boundary between tort and contract." Put differently, *Biakanja* does not displace the contractual economic loss rule when that rule squarely applies. (See *Stop Loss Ins. Brokers, Inc. v. Brown & Toland Medical Group* (2006) 143 Cal.App.4th 1036, 1042 ["Contrary to [the plaintiff's] assumption, courts have not applied the *Biakanja* factors to create broad tort duties in arms-length business dealings whenever it is convenient to resort to the law of negligence"]; *Body Jewelz, Inc. v. Valley Forge Ins. Co.* (C.D.Cal. 2017) 241 F.Supp.3d 1084, 1093 (*Body Jewelz*); *Elsayed v. Maserati N. Am., Inc.* (C.D.Cal. 2016) 215 F. Supp.3d 949, 963 (*Elsayed*); *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.* (C.D.Cal. 2009) 660 F.Supp.2d 1163, 1180; *City & Cty. of San Francisco v. Cambridge Integrated Servs. Grp., Inc.* (N.D.Cal., Nov. 29, 2006, No. C 04-1523 VRW) 2006 U.S.Dist. Lexis 103853, pp. *9–*12; *Department of Water Los Angeles v. ABB Power T&D* (C.D.Cal. 1995) 902 F.Supp. 1178, 1189; see also Rest., § 1, com. c, p. 3.)

Subsequent to *Biakanja,* we have repeatedly stated that its factors are used to determine whether persons must exercise reasonable care to avoid negligently causing economic loss to others with whom they were *not* in privity (sometimes referred to as third parties). (See, e.g., *Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1013–1014 (*Centinela*) [" '[r]ecognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule, in negligence law' . . . . The test for determining the existence of such an exceptional duty to third parties is set forth in the seminal case of *Biakanja*" (citation omitted)]; *Aas,*

*supra*, 24 Cal.4th at pp. 643–644 ["In *Biakanja*, we held that a defendant's negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity could support recovery if the defendant was under a duty to protect those interests"]; *Quelimane*, *supra*, 19 Cal.4th at p. 58 [discussing *Biakanja* in the context of "existence of a duty to third parties"]; *Bily*, *supra*, 3 Cal.4th at p. 397 ["We have employed a checklist of factors [laid out in *Biakanja*] to consider in assessing legal duty in the absence of privity of contract between a plaintiff and a defendant"]; *J'Aire*, *supra*, 24 Cal.3d at p. 804 ["Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity. *Biakanja* . . . [so] held"]; *Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 865 (*Connor*) ["The fact that Great Western was not in privity of contract with any of the plaintiffs except as a lender does not absolve it of liability for its own negligence in creating an unreasonable risk of harm to them [for the role it played in the construction of the properties]. . . . The basic tests for determining the existence of such a duty are clearly set forth in *Biakanja*"]; cf. *Brown*, *supra*, 11 Cal.5th at pp. 217–218 [in holding the multifactor test set forth in *Rowland* was intended "as a means for deciding whether to limit a duty derived from other sources" finding relevant the fact that "in numerous cases since *Rowland*, we have repeated that the *Rowland* factors serve to determine whether an exception to [Civil Code] section 1714's general duty of reasonable care is warranted"].)

In contrast, we have never done what plaintiff now asks us to do:  rely on *Biakanja* to impose a tort duty on a contracting

party to avoid negligently causing monetary harm to another party to that contract. (Cf. *Brown*, *supra*, 11 Cal.5th at p. 219 [in rejecting a litigant's argument, finding significant the fact that no "decision of this court has done what [the litigant] asks us to do"].) Neither *Connor*, *supra*, 69 Cal.2d 850, nor *Aas*, *supra*, 24 Cal.4th 627, reaches a contrary conclusion. Plaintiff relies heavily on this pair of cases, arguing they show that *Biakanja* "is not limited to 'stranger' cases where the parties are not in privity." A careful reading of these authorities reveals they do not bear the weight plaintiff places on them.

In *Connor*, the defendant Great Western Savings and Loan Association (Great Western) was involved in both the construction of a residential tract development and lending funds to eventual buyers of the residences. (*Connor*, *supra*, 69 Cal.2d at pp. 857–862.) When the buyers of the homes — some of whom were in contractual privity with Great Western in its capacity as a mortgage lender — discovered "serious damages from cracking caused by ill-designed foundations," they sued Great Western along with other parties. (*Id.* at p. 856.) In determining whether Great Western could be held liable for its negligence in connection with the construction of defective homes, we emphasized: "Great Western voluntarily undertook business relationships with [a development company] to develop the Weathersfield tract and to develop a market for the tract houses in which prospective buyers would be directed to Great Western for their financing. In undertaking these relationships, Great Western became much more than a lender content to lend money at interest on the security of real property. It became an active participant in a home construction enterprise. It had the right to exercise extensive control of the enterprise." (*Id.* at p. 864.) We also stressed

aspects of Great Western's role as a construction lender, i.e., its function as a lender of funds to the developing company, "which made the enterprise possible." (*Ibid.*) In contrast, we had little to say about Great Western's loans to the eventual home buyers — the individuals with whom Great Western had a contractual relationship — other than that Great Western extracted certain concessions from the development company to ensure that its loans to the buyers would be profitable. (*Ibid.*)

We proceeded to apply the *Biakanja* factors and concluded from this exercise that Great Western owed a duty to the home buyers "to exercise reasonable care to protect them from damages caused by major structural defects." (*Connor, supra*, 69 Cal.2d at p. 866.) "The fact that Great Western was not in privity of contract with any of the plaintiffs except as a lender," we said, "does not absolve it of liability for its own negligence in creating an unreasonable risk of harm to them." (*Id.* at p. 865.)

Seizing on the language within *Connor, supra*, 69 Cal.2d 850 acknowledging that Great Western was "in privity of contract with [some] of the plaintiffs . . . as a lender" (*id.*, at p. 865) plaintiff argues that *Biakanja* is applicable even when the litigating parties are contracting partners. Plaintiff ignores the fact that Great Western was not sued for conduct it engaged in as a residential lender, but for its role in developing the tract housing. In other words, the *Connor* plaintiffs' claim was independent of the lending contract they had with the defendant. For the purpose of the suit, the plaintiffs and the defendant in *Connor* were economic strangers. It is for this reason that we have since characterized *Connor* as a case in which "[w]e found that a construction lender had a duty to *third party* home buyers . . . ." (*Quelimane, supra*, 19 Cal.4th at p. 58, italics added ["We found that a construction lender had a duty

to *third party* home buyers in *Connor* . . . , because the lender had control over the quality of construction but failed to prevent major construction defects in the homes whose construction it financed"].)  In such cases, there is no reason that *Biakanja*, under its plain terms, would be inapplicable.

*Aas* is likewise unhelpful to plaintiff, although for a different reason.  In *Aas*, the question was "whether homeowners and a homeowners association may recover damages in negligence from the developer, contractor and subcontractors who built their dwellings for construction defects that have not caused property damage." (*Aas*, *supra*, 24 Cal.4th at p. 632.)  The litigants in *Aas* were contracting parties for the purposes of the suit.  Because they were contracting parties, *Aas* recognized a concern that counseled against allowing the plaintiffs to recover in tort — namely, such recovery would result in an expansion of tort at the expense of contract principles. (See *id.* at pp. 635–636.)  This was the same concern underlying *Seely*, *supra*, 63 Cal.2d 9, the matter in which we first articulated the contractual economic loss rule, and the *Aas* court discussed *Seely* and its progeny at length.  (See *Aas, supra*, 24 Cal.4th at pp. 639–643.)  Based on *Seely*, *Aas* concluded that the economic loss rule barred the plaintiffs' tort claim.  (*Aas,* at p. 632 ["Applying settled law limiting the recovery of economic losses in tort actions (*Seely* . . .), we answer the question [presented] in the negative"]; *id.* at p. 636.)

In addition to explaining that the plaintiffs were precluded from recovering in tort by the economic loss rule, the *Aas* court engaged the plaintiffs' contentions on their own terms. The plaintiffs in *Aas* asserted that *J'Aire*, a decision for which *Biakanja* served as the "acknowledged basis" (*Aas*, *supra*, 24 Cal.4th at p. 638), "displace[d] the general rule" of *Seely*.  (*Aas*,

at p. 645.) In grappling with this argument, *Aas* noted that "[w]hile the court in *J'Aire* purported only to address duties owed to persons not in contractual privity with the defendant [citation], [California appellate] courts subsequently have applied *J'Aire* to cases in which privity did exist." (*Aas*, at p. 645.) Although *Aas* was critical of the "subjective" "multifactor balancing test set out in *J'Aire*," it nonetheless explained why even if that test — identical to that found in *Biakanja* — applied "to cases in which privity did exist," no duty would be found. (*Aas*, at pp. 646, 645.)

Thus, in addressing and ultimately rejecting the plaintiffs' negligence theory, *Aas* did consider, in a belt-and-suspenders fashion, how the *Biakanja* factors applied to the facts before it. (*Aas*, *supra*, 24 Cal.4th at pp. 646–649; see also *Brown*, *supra*, 11 Cal.5th at p. 219 [explaining that although a case from this court may have considered a set of factors in a "belt-and-suspenders fashion" to " 'explain further why we should not impose a duty,' " this does not mean that those factors constitute the sole mode of analysis to determine whether a duty exists].) But *Aas* never squarely addressed the proper role of *Biakanja* in a case involving contractual parties. Its engagement with the *Biakanja* factors simply responded to the plaintiffs' argument, as well as a separate opinion embracing that argument, rather than amounting to a reasoned extension of *Biakanja* to a new context. (See *Aas*, at pp. 665–673 (conc. & dis. opn. of George, C. J.).) Indeed, *Aas* itself offers no explanation regarding why *Biakanja* ought to "address duties owed to persons . . . in contractual privity with the defendant." (*Aas*, at p. 645.) Furthermore, no subsequent case has interpreted *Aas* as sanctioning an expansion of the *Biakanja* factors to determine whether one contractual party owes another a tort duty. *Aas*

therefore cannot be properly understood as endorsing the *Biakanja* factors as applicable to fact patterns such as the one before us.

Finally, there is good reason that our precedents have applied the *Biakanja* multifactor test to find liability only when the parties to a proceeding are contractual strangers. Recall that the six (nonexclusive) *Biakanja* factors are: "[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) The first, second, and fourth *Biakanja* factors are heavily skewed in favor of liability in cases where the litigants are contractual partners and the alleged duty arises from the underlying contract. (See *Elsayed*, *supra*, 215 F.Supp.3d at p. 963 ["The first, second, and fourth [*Biakanja*] factors would almost always find a special relationship between directly-contracting parties: the transaction would always be intended to affect the plaintiff, the harm would nearly always be foreseeable, and the connection between the defendant's conduct and the injury would always be close"]; *Body Jewelz, supra*, 241 F.Supp.3d at p. 1093 [same]; Sharkey, *supra*, 85 U.Cin. L.Rev. at p. 1034.) Applying *Biakanja* in this and other similar contexts thus would unduly tip the scale in favor of finding a tort duty and subvert the economic loss rule in a class of cases in which that principle clearly applies. (See, e.g., *Seely*, *supra*, 63 Cal.2d at p. 18; Sharkey, *supra*, 85 U.Cin. L.Rev. at p. 1034.)

Even in the present case, in which the negligence claim arises out of a contract between the parties if not from the

breach of an obligation provided for in the contract, the *Biakanja* test cannot be coherently applied. Consider, for example, the first of the *Biakanja* factors, "the extent to which the transaction was intended to affect the plaintiff." (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) What is the relevant transaction between plaintiff and Wells Fargo for purposes of this factor? None of our prior cases applying *Biakanja* had to confront such an issue because in those cases, the defendants had a preexisting duty to fulfill specified responsibilities and the question before the courts was whether a failure to satisfy these obligations allowed the plaintiffs to sue the defendants in tort. For instance, in *Biakanja*, the defendant notary was under an obligation to the plaintiff's brother to properly prepare his will and the issue was whether the plaintiff could sue in light of the notary's negligence in failing to have the will attested. (See *Biakanja*, at p. 648 ["The court found that defendant agreed and undertook to prepare a valid will"].) In *Bily*, the accounting firm owed to a client company a "duty of care in the preparation of an independent audit of [the] client's financial statements," and we determined whether individuals other than the client may sue the firm when it allegedly botched the audit. (*Bily*, *supra*, 3 Cal.4th at p. 375.) In *J'Aire*, the defendant contractor undertook "construction work pursuant to a contract with the owner of premises" that it had to finish "within a reasonable time," and the inquiry was whether the contractor "may be held liable in tort for business losses suffered by a lessee when the contractor negligently fails to complete the project with due diligence." (*J'Aire*, *supra*, 24 Cal.3d at p. 802.) Similarly, in *Aas*, the issue was whether the plaintiffs "may recover damages in negligence from the developer, contractor and subcontractors

45

who built their dwellings for construction defects that have not caused property damage." (*Aas*, *supra*, 24 Cal.4th at p. 632.)

The "transaction" in all of the aforementioned cases was thus the task — the preparation of a will, an audit of a client's business, the construction of a dwelling, etc. — that the defendants already were lawfully obligated to carry out. Here, the analogous agreement is the *original* mortgage contract between plaintiff and Wells Fargo. But plaintiff is not making an argument that Wells Fargo's failure to fulfill its duties under that agreement entitles him to sue it in tort; indeed, he disavows any reliance on the mortgage contract, repeating that he (the counterparty to the agreement) has no contract claim. He argues instead that a loan *modification*, if it had been agreed upon, would have been intended to benefit him. Plaintiff offers no explanation why the loan *modification* he sought is the relevant "transaction" for purposes of the first *Biakanja* factor. This uncertainty illustrates how *Biakanja*, as we have understood and applied it, is a poor framework for assessing whether there is a duty in a situation such as this.

Therefore, on both doctrinal and pragmatic grounds, we conclude that the *Biakanja* factors are not applicable when, as here, the litigants are in contractual privity and the plaintiff's claim is not "independent of the contract arising from principles of tort law." (*Erlich*, *supra*, 21 Cal.4th at p. 551.)

### b. Policy Considerations

As previously discussed, the rationales behind the economic loss rule provide a compelling basis to reject "a duty of care to process, review and respond carefully and completely to . . . loan modification applications." Plaintiff, however, argues that the "policy of preventing future harm" (*Biakanja*, *supra*,

49 Cal.2d at p. 650) — and more generally the " ' "sum total" ' " of policy considerations (*Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 841) — require the recognition of his claim. We cannot agree.

Plaintiff raises two broad policy arguments. First, he argues that without the ability to bring a negligence claim, he would be left "without any remedy at all" and as such, a viable tort claim is needed to prevent injury to borrowers like himself. Yet there are causes of action *other* than a general claim of negligence for failing to exercise reasonable care in processing, reviewing, and responding to a borrower's loan modification application that may offer recourse to borrowers who suffer injury due to missteps by a lender (or loan servicer) in connection with the handling of a mortgage modification application.[10] Two such causes of action are negligent misrepresentation and promissory estoppel. (See, e.g., *Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158

---

[10] And of course, in situations when a borrower has been injured by a lender's intentional conduct during the loan modification process, the borrower may pursue various intentional tort theories, such as fraud and intentional misrepresentation. (See, e.g., *Robinson, supra,* 34 Cal.4th at p. 984 [holding that the economic loss rule does not apply to claims for intentional misrepresentation or fraud]; see also *Meixner v. Wells Fargo Bank, N.A.* (E.D.Cal. 2015) 101 F.Supp.3d 938, 955–957 [finding that the plaintiff had properly pleaded an intentional misrepresentation claim against a bank for conduct taken in a loan modification process]; *McGee v. Citimortgage* (D.Nev., May 31, 2013, No. 2:12-CV-2025 JCM (PAL)) 2013 U.S.Dist. Lexis 76675, pp. *14–*15 [finding that the plaintiff had stated a fraud claim].)

Cal.App.4th 226, 243; *C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 6.)

Regarding the former, although plaintiff purports to bring only a negligence claim, his allegations to some degree focus on alleged misrepresentations. He pleads, for example, that Wells Fargo called and spoke to his wife, informing her "there would be no . . . foreclosure sale of Plaintiff's home." He also alleges that the telephone call further convinced him that his "home was no longer collateral for any debt Plaintiff owed to Wells Fargo" and the debt had been "modified such that it was now unsecured." Based on such a belief, plaintiff allegedly forwent pursuing alternatives to foreclosure and, as a result, eventually lost his house to foreclosure. Because "[n]egligent misrepresentation is a separate and distinct tort" from negligence (*Bily, supra*, 3 Cal.4th at p. 407), plaintiff is not estopped from asserting a negligent misrepresentation claim merely because his negligence claim fails.

As for promissory estoppel, plaintiff argues that he could not bring such a claim because the elements of that claim "are difficult to establish in the mortgage modification context." Yet, plaintiff did assert a claim for promissory estoppel against the entities that foreclosed on his home, Mirabella and FCI, and we perceive no reason why such claims would be generally unavailable to borrowers in the modification context. (Cf. *Wigod, supra*, 673 F.3d at p. 566 [holding that a borrower has "adequately alleged her claim of promissory estoppel" by pleading that the bank promised her that "if she made timely payments and accurate representations during the trial period, she would receive an offer for a permanent loan modification calculated using [certain] methodology"]; accord, *Sheen, supra*, 38 Cal.App.5th at p. 348 [court below concludes that extension

48

of "tort duties into mortgage modification negotiations" is unwarranted, in part, because "other bodies of law — breach of contract, negligent misrepresentation, promissory estoppel, fraud, and so forth — are better suited to handle contract negotiation issues"]; Rest., § 3, com. e, p. 4 ["A party may be injured by reliance on another's negligent statements in the course of negotiating a contract that is never concluded. . . . Detailed doctrines in the law of contract, of restitution, and of estoppel have developed to provide relief in such cases where necessary"].)

Furthermore, even taking at face value plaintiff's argument that "no other source of law addresses the harm that [he] identifies," plaintiff is not limiting the sought-for tort duty to only those instances when other sources of law fall short. As plaintiff acknowledges, he is asking this court to "recognize a negligence-based duty of care that would cover all types of mortgage loans," "including . . . those [already] covered by [HBOR]." "That duty," stresses plaintiff, "would be broader than the narrow affirmative duties imposed by HBOR." In essence, even if plaintiff has identified a gap in the law, he is not proposing to fill that gap. Instead, he seeks to layer a new and expansive negligence cause of action atop all existing laws, imposing a tort duty with indefinite boundaries.

We are unpersuaded that such a remedy should be created by judicial fiat. Plaintiff recognizes that lawmakers at both the state and federal levels have been active in regulating the mortgage loan modification process. As one amicus curiae observes, during the past 10 years, "[t]here has been an extraordinary profusion of new, robust and still-expanding consumer laws, regulations and enforcement authority" in the mortgage service industry, especially with regard to the

regulation of "the conduct of mortgage servicers in distressed loan situations." To be sure, these laws and regulations do not occupy the field and preclude us from acting. (See, e.g., Civ. Code, § 2924.12, subd. (g) [specifying that "[t]he rights, remedies, and procedures provided by [HBOR] are in addition to . . . any other rights, remedies, or procedures under any other law"].) Nonetheless, they counsel against our taking action merely because we may. (Cf. *Connor*, *supra*, 69 Cal.2d at p. 868 ["There is no assurance, however, that the Legislature will undertake such a task [to regulate the challenged industry]. In the absence of actual or prospective legislative policy, the court is free to resolve the case before it . . . in terms of common law"].) This is especially so given that each time that Congress or our state Legislature has acted, it has passed detailed regulations specifying in minutia the obligations of lenders who handle mortgage modification applications. In contrast with such detailed schemes, tort liability — with a yet-to-be articulated standard of care — is ill defined and amorphous. We remain uncertain how such differing regulatory and statutory frameworks will function in practice, much less that they might operate together to better serve the interests of borrowers, lenders, or the public at large. The vagueness and breadth of plaintiff's proposed duty thus counsel against imposing that duty to correct for the problems he contends exist.

Plaintiff's second argument, that allowing his tort claim to go forward will "prevent[] future harm," relies on asserted market failures within the mortgage industry. (*Biakanja*, *supra*, 49 Cal.2d at p. 650.) The main alleged market failure on which plaintiff focuses is a principal-agent problem whereby servicers (the agents) do not act in the best interests of the loan owners (their principals) and in the process, cause harm to

borrowers. Plaintiff's argument is as follows. Unlike "[t]raditional mortgage lending" in which a single bank would both originate the loan and service it, "[i]n modern mortgage servicing," "these tasks have been dispersed among different actors." Now, plaintiff asserts, it is frequently the case that an entity that services a loan does not own the loan. And as "modern mortgage servicing has become divorced from loan ownership," the servicer develops interests that diverge from the loan owner's. Because the fee a servicer collects "does not depend on loan performance, nor on maximizing net present value through a modification," servicers seek neither to ensure that loans perform nor to modify the loans when doing so would be profitable to the loan owners (i.e., when it would "maximiz[e] [the] net present value" of the loan). Instead, "servicers have incentives to charge borrowers unnecessary fees and to extend default," presumably because such actions inflate the servicing fees. Such market failures, plaintiff argues, justify judicial intervention.

We observe at the outset that insofar as plaintiff has identified a problem, he is not proposing to tailor his proposed solution to the problem in any way. Here, Wells Fargo was the originator, owner, and servicer of plaintiff's loans at the time of the challenged conduct. There could be no principal-agent problem in such circumstances because Wells Fargo was both the principal (owner) and agent (servicer) in managing plaintiff's loans. (Accord, e.g., Levitin, *supra*, 28 Yale J. on Reg. at p. 11 ["A traditional portfolio lender has an undivided economic interest in the loan's performance and therefore fully internalizes the costs and benefits of its management decisions, such as whether to restructure or foreclose on a defaulted loan"].) Despite the fact that Wells Fargo was behaving much

as banks involved in "[t]raditional mortgage lending" do, plaintiff would have us impose a duty on Wells Fargo regardless. It is difficult to see how doing so would be justified when the asserted basis for the duty is that servicers do not act in the owners' interests.

Moreover, even taking the principal-agent problem at face value, plaintiff has not supplied a convincing reason why tort law is the right approach to correct such a problem. Some of the problems plaintiff perceives have been anticipated and (at least partially) addressed by the principals and agents themselves. For example, although plaintiff claims that servicers have incentives to "extend default" because such extensions generate additional fees for servicers, he does not mention that as long as the borrowers are in default, the servicers are obligated by their agreements with loan owners to advance the payments that the borrowers are missing. (See Odinet, Foreclosed: Mortgage Servicing and the Hidden Architecture of Homeownership in America (2019) pp. 53–54 (Odinet) ["The mortgage middlemen pick up the tab when homeowners default, meaning that the servicer is responsible for making principal and interest payments to the [loan owners] when monthly mortgage payments from borrowers are not forthcoming"].) Plaintiff does not explain why such private ordering is inadequate or unsatisfactory.[11] And it is unclear how allowing borrowers to

---

[11] Nor does plaintiff satisfactorily explain how imposing the duty he presses here would encourage servicers to engage in the modification process rather than simply foreclose. After all, if a servicer proceeds immediately to foreclosure instead of accepting or processing a modification application, it (and the lender) presumably cannot be held negligent for having failed to

bring lawsuits against servicers and lenders indiscriminately is likely to properly adjust the incentives between those entities.

The Attorney General, in his briefing in support of plaintiff, points to another source of asserted market failure. He argues that residential borrowers suffer from optimism bias and therefore do not bargain over obligations that would arise only when they default. But if the problem is undue optimism, then legislation requiring information to temper that optimism — or a new mandatory insurance scheme, whereby all homeowners, no matter how optimistic, are forced to pay for the cost of "help from their servicers to avoid foreclosure" — would seem more appropriate and directly responsive than tort liability.

## C. The Role of the Legislature

This brings us to the fact that recognizing a duty of the sort plaintiff presses for here would impose real costs — and challenging decisions to be made about who should bear those costs. As one commentator reports, "the cost of servicing a default mortgage loan was 15 times higher than the cost of managing one that was not in default ($2,537 compared to $156)." (Odinet, *supra*, at pp. 119–120.) Any changes to the mortgage industry that require servicers to raise the level of the service they provide — to "process, review and respond [more] carefully and completely to the loan modification applications" than they are currently doing — will likely raise the cost of

exercise a specific standard of care in handling any such application. (Accord, *Cenatiempo*, *supra*, 219 A.3d at p. 793 ["If the court were to recognize a common-law duty of care, . . . it could result in loan servicer liability for isolated violations or far less consequential violations of the loan modification process, which would hinder servicer participation in the modification process"].)

providing that service as well. (Levitin, *supra*, 28 Yale J. on Reg. at p. 89 ["It bears emphasis that changes to the servicing market could result in higher mortgage costs"].) "This reality is a policy tradeoff . . . ." (*Ibid.*) In particular, "[a]ny reform of mortgage servicing to make it more conducive to loss mitigation via loan restructuring could add to the cost of mortgage finance and thereby discourage new homeownership. Thus, any mortgage servicing reform must be considered as part of a trade-off between making home purchases more affordable and ensuring sustainable, long-term homeownership levels." (*Id.* at p. 8.)

This is far from suggesting that reforms to the mortgage service industry would not be worthwhile. Instead, it is to emphasize the tradeoffs and policy judgments underlying such reforms. These are policy choices that the judiciary is poorly positioned to make. The Legislature, on the other hand, "has at its disposal a wider range of options and superior access to information about the social costs and benefits of each" policy. (*Aas*, *supra*, 24 Cal.4th at p. 652 [" 'Legislatures, in making such policy decisions, have the ability to gather empirical evidence, solicit the advice of experts, and hold hearings at which all interested parties may present evidence and express their views' "]; see also *Gas Leak Cases*, *supra*, 7 Cal.5th at p. 413 ["[T]he Legislature can bring to bear a mix of expertise while considering competing concerns to craft a solution in tune with public demands"].) With these tools at its disposal and acting "through the democratic process" (*Gas Leak Cases*, at p. 413), the Legislature can best decide what additional protection homeowners in California should be afforded. (See *Aas*, at pp. 652, 653 [observing "[h]ome buyers in California already enjoy protection" under various bodies of law for the harms alleged and concluding that "the Legislature may add whatever

additional protections it deems appropriate" but that we should not "preempt the legislative process with a judicially created rule of tort liability"].)  In particular, should it choose to the Legislature can both prescribe whether a lender must act "reasonably" and (in some detail, if it chooses) what constitutes "reasonable" behavior within this sphere.  Because such decisions carry "[t]he potential for . . . broad-ranging economic consequences," including the possibility of "increas[ing] the already prohibitively high cost of housing in California," "affect[ing] the availability of" cheap financing options for would-be homeowners, and "greatly diminish[ing] the supply of affordable housing," the task of making such policy decisions "should be left to the Legislature." (*Erlich*, *supra*, 21 Cal.4th at p. 560; see also *Cates Construction*, *supra*, 21 Cal.4th at pp. 60–61; *Foley*, *supra*, 47 Cal.3d at p. 694.)

In sum, the Legislature is better situated than we are to tackle the "[s]ignificant policy judgments affecting social policies and commercial relationships" implicated in this case.  (*Foley*, *supra*, 47 Cal.3d at p. 694; see also *Aas*, *supra*, 24 Cal.4th at p. 652.)  In recognition of the institutional competence of our coequal branch of government, we decline plaintiff's invitation to become the first state high court to create a judicial rule imposing a duty on lenders to exercise due care in processing, reviewing and responding to loan modification applications.[12]

---

[12]    To the extent they are inconsistent with our opinion, we disapprove of *Weimer v. Nationstar Mortgage, LLC*, *supra*, 47 Cal.App.5th 341; *Rossetta v. CitiMortgage, Inc.*, *supra*, 18 Cal.App.5th 628; *Daniels v. Select Portfolio Servicing, Inc.*, *supra*, 246 Cal.App.4th 1150; and *Alvarez v. BAC Home Loans Servicing, L.P.*, *supra*, 228 Cal.App.4th 941.  We have no

### III. CONCLUSION

We hold that when a borrower requests a loan modification, a lender owes no tort duty sounding in general negligence principles to "process, review and respond carefully and completely to" the borrower's application. Because the Court of Appeal's decision is in accord, we affirm the judgment below.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**McCONNELL, J.** *

---

occasion to consider the viability of claims other than the negligence cause of action presented in these cases. In particular, nothing we say should be understood to address whether some of the conduct considered by the Courts of Appeal would support negligent misrepresentation or promissory estoppel claims.

\* Administrative Presiding Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

SHEEN v. WELLS FARGO BANK, N.A.

S258019

Concurring Opinion by Justice Liu

The question in this case is whether defendant Wells Fargo Bank owed plaintiff Kwang K. Sheen a "duty of care to process, review and respond carefully and completely to the loan modification applications" Sheen submitted. The court answers no to this question, and I concur with this limited holding. Sheen sought modification of two junior loans from Wells Fargo, a lender that made no representations or assurances regarding the modification. Wells Fargo had no obligation to accept, consider, or approve the modification, and mere receipt of Sheen's application did not give rise to a tort duty of care in the circumstances here.

But this case calls our attention to an important area that may warrant further consideration by the Legislature. As many reported decisions detail, borrowers seeking mortgage loan modifications may be strung along by loan servicers' incompetence, pursuit of fees, or improper incentives over the course of years, leading borrowers to forgo other remedies. According to Sheen, the California Homeowner Bill of Rights (HBOR), designed "to ensure that . . . borrowers are considered for, and have a meaningful opportunity to obtain, available loss mitigation options" (Civ. Code, § 2923.4), "imposes a narrow set of duties on servicers"; its "protections are insufficient to cover the myriad ways in which a servicer's negligence can injure borrowers when it comes to loan modification." The frequency with which these issues are making their way through the

courts — along with what the Civil Justice Association of California, California Chamber of Commerce, and Western Bankers Association as amici curiae call the "Damoclean repeat of the 2008–2012 foreclosure crisis [that] looms on the horizon" — suggests that legislative action may be warranted.

## I.

Today's opinion holds that Wells Fargo owed Sheen no " 'duty of care to process, review and respond carefully and completely to the loan modification applications' " he submitted. (Maj. opn., *ante*, at p. 1.)  Sheen alleged that "Wells Fargo never contacted [him] about the status of his mortgage modification applications, or to inform his as to whether his applications for modification . . . had been approved or rejected."  He did not allege that Wells Fargo made the type of representations or exhibited the affirmative conduct relating to modification that courts have relied on in finding a duty in related contexts.  (See, e.g., *Weimer v. Nationstar Mortgage, LLC* (2020) 47 Cal.App.5th 341, 348–350, 359, 362 (*Weimer*) [borrower alleged Nationstar, in order to continue collecting fees from servicing a delinquent account, forced him to submit the same applications and documents on multiple occasions and instructed him to apply for a program he was ineligible for]; *Rossetta v. CitiMortgage, Inc.* (2017) 18 Cal.App.5th 628, 643 (*Rossetta*) [borrower alleged CitiMortgage told her that she needed to be at least three months delinquent for it to assist her and required her to submit the same documents over and over again, lost or mishandled documents, misstated the status of various applications, and ultimately denied them for "bogus reasons"]; *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1158 [borrowers alleged Bank of America advised them to miss payments to qualify for modification, told them to make reduced

monthly payments, assured them they would be granted a modification if they complied with the bank's instructions, and required them to submit duplicative documentation after assuring them that the necessary documents had been received]; *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941, 944–945, 948–949 (*Alvarez*) [borrowers alleged servicers agreed to consider their modification applications, relied on incorrect information and mishandled submitted documents, prevented the applications from being processed in a timely manner, and deterred borrowers from seeking other remedies]; see also *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 881 (*Jolley*) [borrower testified that Chase reassured him on many occasions that there was a high likelihood it would be able to modify the loan, which he relied on in borrowing heavily to finish the project].)

Instead, Sheen alleged that because Wells Fargo failed to respond to his applications, subsequent communication concerning the delinquency on his accounts led him to believe that his loans had been modified. (Maj. opn., *ante*, at pp. 4–6.) Sheen also alleged that Wells Fargo told his wife "there would be no more foreclosure sale" of the home. While these allegations may support a claim for negligent misrepresentation (maj. opn., *ante*, at p. 48), failure to respond to an application falls short of the type of affirmative conduct and ongoing interaction with lenders or servicers regarding modification that lead borrowers to believe they just need to keep working with servicers to secure modification and avoid foreclosure.

Recognizing a duty of care may well be justified where a lender or servicer makes assurances that an application is being considered or advises an applicant on a certain course of action, and then proceeds to mishandle documents, misstate the

application's status, require an applicant to submit duplicate or nonexistent documents, or otherwise string the applicant along and cause the applicant to forgo alternative remedies. (See *Rossetta, supra,* 18 Cal.App.5th at p. 645 (conc. opn. of Mauro, Acting P. J.) [emphasizing that the duty of care arose not from the "lender's mere receipt or review of [the] borrower's loan modification application" but from the allegations concerning CitiMortgage's conduct]; *Jolley, supra,* 213 Cal.App.4th at p. 898 ["where specific representations were made by a Chase representative as to the likelihood of a loan modification, a cause of action for negligence has been stated that cannot be properly resolved based on lack of duty alone"].) But such allegations are not before us in this case. While disapproving *Weimer, Rossetta, Daniels,* and *Alvarez* "to the extent they are inconsistent with" today's opinion (maj. opn., *ante,* at p. 55, fn. 12), the court does not address whether a lender's or servicer's affirmative conduct may give rise to a duty to process the application with due care.

Today's opinion also leaves for another day the applicability of other causes of action to servicer misconduct and the scope of related doctrines. The court highlights that negligent misrepresentation and promissory estoppel "may offer recourse to borrowers who suffer injury due to missteps by a lender (or loan servicer) in connection with the handling of a mortgage modification application." (Maj. opn., *ante,* at p. 47.) While Sheen did not seek leave to amend his complaint to state either of these causes of action, today's opinion makes clear that "nothing we say . . . should be understood to categorically foreclose those claims in the mortgage modification context." (*Id.* at p. 3; see *id.* at p. 48 ["we perceive no reason why such claims would be generally unavailable to borrowers"].) Nor does today's opinion consider whether the doctrine of promissory

estoppel or negligent misrepresentation may require clarification or reform to respond effectively in this context. (See Rest.3d Torts, Liability for Economic Harm (June 2020) § 3, com. d., p. 4 (Restatement) ["if denying relief to the plaintiff seems to produce an injustice," it may be necessary "to reconsider the application" of doctrines "responsible for the result"]; maj. opn., *ante*, at p. 32 [reciting the Restatement's view].)

Today's opinion also restates the " 'general rule' " that " 'a lender owes no duty of care to a borrower when the lender's involvement in the loan transaction does not exceed its customary role in arms-length lending and servicing.' " (Maj. opn., *ante*, at pp. 21–22; see *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1096.) The court states that "*without more*," a "lender's handling of a modification application" "does not 'exceed the scope of [an institution's] conventional role as a mere lender of money.' " (Maj. opn., *ante*, at p. 24, italics added.) But the court expresses no view on what constitutes " 'extraordinary advice . . . beyond that customary in arms-length lending and loan services transactions' " (*id.* at p. 21) such that it may give rise to a duty of care. (See, e.g., *Rossetta*, *supra*, 18 Cal.App.5th at p. 646 (conc. opn. of Mauro, Acting P. J.) ["agree[ing] with the majority that CitiMortgage engaged in acts and omissions that went beyond the scope of conventional lending"]; *Weimer*, *supra*, 47 Cal.App.5th at p. 362 [concluding that the type of lender activity alleged places it "beyond the mere consideration of [the borrower's] loan modification applications"]; see also *Jolley*, *supra*, 213 Cal.App.4th at p. 902 [" '*Nymark* . . . do[es] not purport to state a legal principle that a lender can never be held liable for negligence in its handling of a loan transaction within its

conventional role as a lender of money.' "]; *Nymark*, at pp. 1098–1099.)

The court today also restates the so-called economic loss rule. In a future case, we may need to grapple with the boundaries of the rule and its application to contexts where parties cannot "reliably be counted on to protect their interests." (Farnsworth, *The Economic Loss Rule* (2016) 50 Val.U. L.Rev. 545, 546 (Farnsworth); see Rest., § 3, com. c., p. 3 ["the purpose of this Section is to protect the bargain the parties made"].) Private ordering through contracts as an alternative to negligence liability through tort is generally more compelling with a " 'more sophisticated class of plaintiffs . . . e.g., business lenders and investors,' " as opposed to "the average home buyer [who] is more akin to 'the "presumptively powerless consumer" ' " with little to no means to alter the agreement in the first place. (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 579, 584, quoting *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 398, 403.) But today's opinion does not state a broad rule against recovery for pure economic loss in tort in the context of a contractual relationship (maj. opn., *ante*, at p. 15), and courts should not invoke the rule without considering the basis for its application. (See Farnsworth, *supra*, 50 Val.U. L.Rev. at p. 550 ["Stating a broad rule against recovery for pure economic loss in tort has [a] worrisome consequence . . . [:] It creates a presumption against liability in cases that don't fit into one of the well-defined exceptions. This can cause legitimate claims to be snuffed out inadvertently by the sweep of the rule in the background. Trouble predictably results when a rule is recited and extended without attention to its rationale."]; see also, e.g., *Tiara Condo. Ass'n. v. Marsh & McLennan Co.* (Fla. 2013) 110

So.3d 399, 407 ["limit[ing] the application of the economic loss rule to cases involving products liability" in light of "the unprincipled extension of the rule" to new domains].)

Moreover, in restating these general rules, today's opinion takes care to consider the policy concerns at play. (Maj. opn., *ante*, at pp. 46–53.) After recognizing that the factors set out in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650, do not provide the proper framework for considering the policy concerns present in this case (maj. opn., *ante*, at p. 46), the court proceeds to consider the relevant concerns, as we must in any case claiming a duty of care in tort. (See, e.g., *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 399 ["the inquiry hinges . . . on a comprehensive look at ' "the sum total" ' of the policy considerations at play in the context before us"]; *Erlich v. Menezes* (1999) 21 Cal.4th 543, 552 [" ' "Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability." ' "]; see also *Flagstaff Housing v. Design Alliance* (Ariz. 2010) 223 P.3d 664, 669 ["The economic loss doctrine may vary in its application depending on context-specific policy considerations."].)

## II.

Importantly, today's opinion recognizes that while "lawmakers at both the state and federal levels have been active in regulating the mortgage loan modification process" (maj. opn., *ante*, at p. 49), borrowers continue to face serious difficulties with servicers and the loan modification process (*id.* at p. 35).

When borrowers first seek a loan, they are generally able to choose among various lenders. But, practically speaking,

they have little ability to negotiate terms. As the Attorney General appearing as amicus curiae states, "[m]ost homeowners do not have the technical knowledge of mortgage servicing that would be necessary to request meaningful, consumer-protective contract terms." And "[e]ven if homeowners are knowledgeable and concerned about management of their loan upon default, they cannot know or choose whether their loan will be securitized, who will be the servicer, and what contractual provisions will govern the servicing of their loan." (Levitin & Twomey, *Mortgage Servicing* (2011) 28 Yale J. on Reg. 1, 83 (Levitin).)

In this context, " 'borrowers are captive, with no choice of servicer, little information, and virtually no bargaining power. . . . Borrowers cannot pick their servicers or fire them for poor performance. The power to hire and fire is an important constraint on opportunism and shoddy work in most business relationships. But in the absence of this constraint, servicers may actually have positive incentives to misinform and under-inform borrowers. Providing limited and low-quality information not only allows servicers to save money on customer service, but increases the chances they will be able to collect late fees and other penalties from confused borrowers.' " (*Alvarez*, *supra*, 228 Cal.App.4th at p. 949.)

As Sheen describes, "[d]uring the modification process, the homeowner has to rely entirely on information from the servicer both about whether the loan is likely to be modified, and on the status of the modification, to make life-changing decisions such as whether to file for bankruptcy, sell the home, or give up the home through foreclosure or deed in lieu of foreclosure." Alternatives to foreclosure may include obtaining alternate funding, refinancing, or receiving modification of other loans

under other programs or with other servicers. Some alternatives may also present less damage to a borrower's credit report than a foreclosure. But these alternatives can become more difficult or impossible to obtain if a servicer mishandles the modification application process. Borrowers have reported accruing "additional arrears, penalties, fees, and harm to [their] credit," potentially affecting their eligibility for alternatives they otherwise would have qualified for. (*Weimer, supra*, 47 Cal.App.5th at p. 361.) And at some point, it simply becomes too late to pursue alternatives. (See *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49, 59 [borrower alleged Bank of America continued to make representations regarding modification within just two weeks of the foreclosure sale].)

It is questionable whether the relationship between lenders or investors and servicers is sufficient to ensure that servicers exercise due care and avoid "unnecessary home foreclosures, to the detriment of homeowners and mortgage investors alike." (Levitin, *supra*, 28 Yale J. on Reg. at p. 4; see *id.* at p. 1 [describing servicers' cost and income structure as "skewed toward foreclosure" and the dysfunctional nature of the loss mitigation component of servicing]; Thompson, *Foreclosing Modifications: How Servicer Incentives Discourage Loan Modifications* (2011) 86 Wash. L.Rev. 755, 761 ["the incentive structure for the servicers . . . generally favors foreclosures over modifications"]; Note, *Mortgage Loan Modification: Barriers to Use* (2009) 28 Rev. Banking & Fin. L. 426, 429–430 [describing servicers' and investors' incentives as not always aligned, leading to a suboptimal number of loan modifications even where there is an agreement requiring a servicer to take actions to maximize the net present value of a securitized portfolio].) Moreover, the loss to the lender or investor fails to reflect the

magnitude of the potential harm foreclosure can have on the individual and broader community. (See, e.g., Sen. Rules Com., Off. of Sen. Floor Analyses, Conf. Rep. on Sen. Bill No. 900 (2011–2012 Reg. Sess.) as amended June 27, 2012, p. 14 ["Foreclosures blight neighborhoods, put financial pressure on families and drive down local real estate values, and consumers, made more cautious by a crippled housing market, spend less freely, curbing the economy's growth."].) Private ordering does not fully account for these externalities.

HBOR provides a number of procedural protections in the context of first-lien mortgage servicing. It prevents "dual-tracking" of foreclosure and loan modification, and requires servicers to assign applicants a single point of contact who must communicate the process to apply for loan modification, notify the borrower of missing documents, adequately inform the borrower of the status of her or his application, and ensure the borrower is considered for all alternatives to foreclosure, if any, offered by the servicer. (Civ. Code, §§ 2923.6, 2923.7, 2924.18.) A servicer must also identify in writing reasons for a denial and give an applicant a chance to appeal before proceeding with a foreclosure. (*Id.*, § 2923.6.) The Legislature may wish to consider whether any of these standards should be extended to servicers of second- or third-lien mortgages. (See Sen. Rules Com., Off. of Sen. Floor Analyses, Conf. Rep. on Sen. Bill 900 (2011–2012 Reg. Sess.) as amended April 26, 2012, p. 26; U.S. Dept. of Treas., Making Home Affordable: Program Update (Apr. 28, 2009) p. 2, available at "Second Lien Program Fact Sheet" <https://www.treasury.gov/press-center/press-releases/Pages/tg108.aspx> [as of Mar. 7, 2022] ["Even if a first lien is modified to create an affordable payment, second liens can contribute to much higher foreclosure rates if not addressed."];

the Internet citation in this opinion is archived by year, docket number, and case name at <http://www.courts.ca.gov/ 38324.htm>.)

In sum, numerous cases demonstrate "the difficulties borrowers face in the loan modification context." (Maj. opn., *ante*, at p. 35.) These difficulties have particular salience as pandemic relief programs wane and foreclosure rates rise. In some instances, a judicial remedy may be available. But given the limitation on common law negligence claims explained in today's opinion, whether the mortgage market and affected communities would benefit from additional protections for borrowers against manipulative practices and "bargaining or information asymmetries" (*ibid.*) continues to be ripe for legislative consideration.

**LIU, J.**

SHEEN v. WELLS FARGO BANK, N.A.

S258019


Concurring Opinion by Justice Jenkins


I write separately to address my participation in *Alvarez v. BAC Home Loans Servicing, L.P.* (2014) 228 Cal.App.4th 941 (*Alvarez*), a Court of Appeal opinion I joined, but which the court now, following a robust discussion of the economic loss rule and the scope of *Biakanja v. Irving* (1958) 49 Cal.2d 647, partially disapproves.

In *Alvarez*, plaintiff borrowers alleged their loan servicers owed them "a duty to exercise reasonable care in the review of their loan modification applications once they had agreed to consider them." (*Alvarez, supra,* 228 Cal.App.4th at p. 944.) The servicers, after they "undertook to review" loan modifications available under the federal Home Affordable Modification Program (HAMP), allegedly breached a duty of care by "(1) failing to review plaintiffs' applications in a timely manner, (2) foreclosing on plaintiffs' properties while they were under consideration for a HAMP modification and (3) mishandling plaintiffs' applications by relying on incorrect information." (*Alvarez,* at p. 945.) "Much of th[is]" was "conduct now regulated by the HBOR" — that is, the then recently enacted California Homeowner Bill of Rights. (*Alvarez,* at p. 951; see maj. opn., *ante,* at pp. 11–12.)

*Alvarez* recognized a duty of care. In doing so, it first restated the general rule of *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, that "a financial institution owes no duty of care to a borrower when the

1

institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (*Alvarez, supra,* 228 Cal.App.4th at p. 945.) After citing *Nymark* and *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, *Alvarez* noted an exception to the general no-duty rule if the factors set forth in *Biakanja* pointed towards a duty. (*Alvarez,* at p. 945; see *Nymark,* at p. 1098 [California's "test for determining whether a financial institution owes a duty of care to a borrower-client ' "involves the balancing of [the *Biakanja*] factors" ' "]; see maj. opn., *ante,* at p. 22.) *Alvarez* concluded the *Biakanja* factors, given the plaintiffs' allegations, favored a duty. (*Id.* at p. 948–951.)

*Alvarez* discussed the *Biakanja* factors at length but did not scrutinize on what basis that multifactor test should apply, if at all, in determining a lender's or servicer's duties towards borrowers. Critically, *Alvarez* did not have occasion to address the contractual economic loss rule or *Biakanja*'s relationship to that rule. In light of the parties' arguments here that crystalize the significance of these important preliminary questions, I agree with the resolution the court reaches today.

Furthermore, the duty Kwang K. Sheen here seeks to impose on Wells Fargo Bank, N.A. — to reasonably "process, review, and respond" to loan modification applications — is not premised on a lender or servicer first agreeing to do those things, which was part of the analysis in *Alvarez.* (*Alvarez, supra,* 228 Cal.App.4th at p. 948 ["because defendants allegedly agreed to consider modification of the plaintiffs' loans, the *Biakanja* factors clearly weigh in favor of a duty"].) The court, today, does not address what liability might ensue, whether for negligence or some other theory such as negligent misrepresentation or promissory estoppel, if a lender or servicer more than merely

agrees to consider a loan modification.  (Maj. opn., *ante*, at pp. 16–17, fn. 4, 47–48.)

With these observations, I concur in the well-reasoned majority opinion.

**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Sheen v. Wells Fargo Bank, N.A.

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 38 Cal.App.5th 346
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S258019
**Date Filed:** March 7, 2022

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Robert Leslie Hess

_____

**Counsel:**

Los Angeles Center for Community Law and Action, Noah Grynberg; Public Justice, Leslie A. Brueckner and Adrienne H. Spiegel for Plaintiff and Appellant.

Huddleston & Sipos Law Group and Robert A. Huddleston for John A. Phillips as Amicus Curiae on behalf of Plaintiff and Appellant.

Xavier Becerra, Attorney General, Nicklas A. Akers, Assistant Attorney General, Michele Van Gelderen and Amy Chmielewski, Deputy Attorneys General, for Attorney General as Amicus Curiae on behalf of Plaintiff and Appellant.

Arbogast Law, David M. Arbogast; Smoger & Associates and Gerson H. Smoger for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Lisa Sitkin; Law Office of Eric Andrew Mercer and Eric Mercer for National Housing Law Project and Eric Mercer as Amici Curiae on behalf of Plaintiff and Appellant.

Kutak Rock, Jeffrey S. Gerardo, Steven M. Dailey; Munger, Tolles & Olson, David H. Fry, Benjamin J. Horwich and Rachel G. Miller-Ziegler for Defendant and Respondent.

Fred J. Hiestand for the Civil Justice Association of California, the California Chamber of Commerce and the Western Bankers Association as Amici Curiae on behalf of Defendant and Respondent.

Wright, Finlay & Zak, Jonathan D. Fink, T. Robert Finlay; Kirby & McGuinn, Martin T. McGuinn and Michael R. Pfeifer for California Mortgage Association, California Mortgage Bankers Association, Mortgage Bankers Association and United Trustees Association as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Leslie A. Brueckner
Public Justice, P.C.
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8205

Benjamin J. Horwich
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4066